**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LORD ABBETT INVESTMENT TRUST – LORD ABBETT SHORT DURATION INCOME FUND, LORD ABBETT INVESTMENT TRUST – LORD ABBETT INFLATION FOCUSED FUND, LORD ABBETT GLOBAL FUND, INC. – LORD ABBETT EMERGING MARKETS CURRENCY FUND, and LORD ABBETT PASSPORT PORTFOLIOS PLC – LORD ABBETT SHORT DURATION INCOME FUND, <br><br> Plaintiffs, <br><br> v. <br><br> PETRÓLEO BRASILEIRO S.A.-PETROBRAS, PETROBRAS GLOBAL FINANCE B.V., MARIA DAS GRAÇAS SILVA FOSTER, JOSÉ SERGIO GABRIELLI DE AZEVEDO, ALMIR GUILHERME BARBASSA, DANIEL LIMA DE OLIVEIRA, JOSÉ RAIMUNDO BRANDÃO PEREIRA, SÉRVIO TÚLIO DA ROSA TINOCO, PAULO JOSÉ ALVES, GUSTAVO TARDIN BARBOSA, ALEXANDRE QUINTÃO FERNANDES, MARCOS ANTONIO ZACARIAS, CORNELIS FRANCISCUS JOZEF LOOMAN, THEODORE MARSHALL HELMS, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, <br><br> Defendants. | No.  15-cv-07615-JSR <br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.    NATURE OF ACTION .................................................................................. 1

II.    FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS ................................ 3

III.    PARTIES ........................................................................................... 6

    A.    PLAINTIFFS ............................................................................... 6

    B.    SECURITIES ACT DEFENDANTS ....................................................... 7

        1.    The Company ..................................................................... 7

        2.    CEO Gabrielli ..................................................................... 8

        3.    The Officer and Director Defendants ........................................ 8

        4.    The Underwriter Defendants................................................. 10

    C.    EXCHANGE ACT DEFENDANTS ...................................................... 11

IV.    JURISDICTION AND VENUE ..................................................................... 11

V.    RELEVANT SECURITIES ......................................................................... 12

    A.    PETROBRAS DEBT – THE 2011 AND 2012 NOTES ............................... 12

    B.    PETROBRAS DEBT – THE 2013 AND 2014 NOTES ............................... 13

VI.    PLAINTIFFS PURCHASED PETROBRAS SECURITIES IN DOMESTIC
    TRANSACTIONS .................................................................................. 16

VII.    SUMMARY OF SUBSTANTIVE ALLEGATIONS ............................................... 17

    A.    BACKGROUND OF PETROBRAS ..................................................... 17

    B.    A BRIBERY SCANDAL ENGULFS PETROBRAS .................................... 18

        1.    Operation Car Wash Uncovers An Enormous Bribery And
            Corruption Scheme Implicating Top Petrobras Officials ................ 18

        2.    An Independent Member Of The Petrobras Board Votes Against
            Approval Of The Company's 2013 Financial Statements ................ 23

        3.    The Abreu e Lima Refinery, Comperj Petrochemical Complex And
            Other Major Projects Are Implicated In The Fraud .................... 24

        4.    Petrobras' Most Senior Executives Knew Of The Fraud ............... 28

        5.    Petrobras Is Subject To Far-Ranging Investigations ................... 33

    C.    PETROBRAS' AUDITOR REFUSES TO APPROVE ITS FINANCIAL STATEMENTS
        FOR THE THIRD QUARTER OF 2014 DUE TO CONCERNS OVER THE BRIBERY
        SCHEME ................................................................................. 34

    D.    PETROBRAS ADMITS THAT THE BRIBERY SCHEME CAUSED ITS ASSET
        VALUATIONS TO BE INFLATED ...................................................... 36

    E.    PETROBRAS MANAGEMENT RESIGNS *EN MASSE* ............................... 40

i

F.   PETROBRAS WRITES OFF $2.5 BILLION IN BRIBE AND CORRUPTION-
RELATED PAYMENTS THAT WERE INAPPROPRIATELY CAPITALIZED .................... 41

VIII.   PETROBRAS' VIOLATIONS OF ACCOUNTING STANDARDS ............................ 44

A.   2009-2010 – US GAAP VIOLATIONS .................................................. 44

B.   2011-2014 – IFRS VIOLATIONS ........................................................ 47

IX.   DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS ...................... 51

A.   FALSE STATEMENTS AND OMISSIONS RELEVANT TO
EXCHANGE ACT CLAIMS ................................................................ 51

1.   May 20, 2010 – 2009 Form 20-F ......................................... 51

2.   August 24-25, 2010 – Press Release And Form 6-K Announcing
Financial Results For The Second Quarter Of 2010 ................................. 53

3.   October 8, 2010 – Facts and Data Post Regarding Overpricing .............. 54

4.   November 9, 2010 – Facts and Data Post Regarding The Repar and
Abreu e Lima Refineries ................................................................. 55

5.   November 23 and 24, 2010 – Press Release And Form 6-K
Announcing Financial Results For The Third Quarter Of 2010 ............... 56

6.   January 18, 2011 – Prospectus Supplement Offering The 2011
Notes ......................................................................................... 56

7.   March 15, 2011 – Press Release Announcing 2010 Financial
Results ....................................................................................... 57

8.   May 24 and 26, 2011 – Press Release And Form 6-K Announcing
Financial Results For The First Quarter Of 2011 .................................. 57

9.   May 26, 2011 – 2010 Form 20-F ......................................... 58

10.   June 6, 2011 – 2010 Sustainability Report ............................ 58

11.   August 14 and 25, 2011 – Press Release And Form 6-K
Announcing Financial Results For The Second Quarter Of 2011 ........... 59

12.   November 22, 2011 – Press Release And Form 6-K Announcing
Financial Results For The Third Quarter Of 2011 ................................ 59

13.   February 3, 2012 – Prospectus Supplement Offering The 2012
Notes ......................................................................................... 60

14.   February 28 and 29, 2012 – Press Release And Form 6-K
Announcing 2011 Financial Results .................................................. 60

15.   April 2, 2012 – 2011 Form 20-F ......................................... 61

16.   May 15, 2012 – Press Release And Form 6-K Announcing
Financial Results For The First Quarter Of 2012 .................................. 61

17.   June 21, 2012 – 2011 Sustainability Report ........................... 62

18. August 3, 2012 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2012 ................................ 63

19. August 29, 2012 – 2012 Registration Statement ...................................... 64

20. October 26, 2012 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2012 ................................. 65

21. December 29, 2012 – Facts and Data Post Regarding Internal Controls ...................................................................................................... 65

22. January 7, 2013 – Facts and Data Posts Regarding The Comperj Refinery .................................................................................................... 66

23. February 4, 2013 – Press Release And Form 6-K Announcing 2012 Financial Results ......................................................................................... 66

24. April 26, 2013 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2013 ..................................... 67

25. April 29, 2013 – 2012 Form 20-F ............................................................. 67

26. May 15, 2013 – Prospectus Supplement For The 2013 Notes ................. 68

27. May 2013 – 2012 Sustainability Report ................................................... 69

28. August 7, 2013 – Facts and Data Posting Regarding The Acquisition of the Pasadena Refinery ........................................................ 70

29. August 9, 2013 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2013 ................................ 71

30. October 25, 2013 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2013 ................................... 71

31. February 25, 2014 – Press Release And Form 6-K Announcing 2013 Financial Results ............................................................................... 72

32. March 11, 2014 – Prospectus Supplement For 2014 Notes ..................... 73

33. April 30, 2014 – 2013 Form 20-F ............................................................. 74

34. May 2014 – 2013 Sustainability Report ................................................... 75

35. May 9, 2014 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2014 ..................................... 76

36. May 10, 2014 – Facts and Data Post Regarding SBM Offshore ............. 77

37. May 19, 2014 – Facts and Data Post Regarding The Abreu e Lima Refinery .................................................................................................... 78

38. May 23, 2014 – Facts and Data Post Regarding Petrobras Payment Procedures And The Pasadena Refinery Acquisition ............................... 78

39. July 12, 2014 – Facts and Data Posting Regarding The Pasadena Refinery And SBM Offshore .................................................................... 80

iii

40. August 8, 2014 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2014 ................................. 80

B. FALSE STATEMENTS RELEVANT TO SECURITIES ACT CLAIMS .............................. 81

1. False Statements And Omissions In The Offering Documents For The 2013 Notes ......................................................................................... 81

2. False Statements And Omissions In The Offering Documents For The 2014 Notes ......................................................................................... 82

X. THE TRUTH EMERGES, LEADING TO LARGE DECLINES IN THE PRICES OF PETROBRAS SECURITIES ......................................................................................... 83

XI. THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER ......................... 98

A. PETROBRAS, PIFCO AND PGF ................................................................................. 99

B. GABRIELLI ................................................................................................................. 101

C. FOSTER ...................................................................................................................... 102

D. BARBASSA .................................................................................................................. 103

XII. PLAINTIFFS RELIED UPON DEFENDANTS' MISREPRESENTATIONS TO PLAINTIFFS' DETRIMENT ..................................................................................... 104

A. PLAINTIFFS' DIRECT RELIANCE ON DEFENDANTS' MISREPRESENTATIONS .......... 104

B. PRESUMPTION OF RELIANCE: THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ............................................................................................. 106

C. NO SAFE HARBOR .................................................................................................... 108

XIII. PLAINTIFFS HAVE SUFFERED LOSSES AS A RESULT OF THEIR PURCHASES OF PETROBRAS SECURITIES ........................................................... 108

XIV. THE ARBITRATION CLAUSE IN PETROBRAS' BYLAWS IS INAPPLICABLE TO PLAINTIFFS ..................................................................................... 109

XV. THE PENDING CLASS ACTION TOLLS THE STATUTES OF LIMITATIONS APPLICABLE TO PLAINTIFFS' CLAIMS ............................................................... 110

XVI. CAUSES OF ACTION ................................................................................................ 110

PRAYER FOR RELIEF ................................................................................................................ 120

JURY TRIAL DEMANDED ......................................................................................................... 120

Plaintiffs Lord Abbett Investment Trust – Lord Abbett Short Duration Income Fund, Lord Abbett Investment Trust – Lord Abbett Inflation Focused Fund, Lord Abbett Global Fund, Inc. – Lord Abbett Emerging Markets Currency Fund, and Lord Abbett Passport Portfolios PLC – Lord Abbett Short Duration Income Fund ("Plaintiffs"), by and through their undersigned counsel, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters.   Plaintiffs' allegations are based on the investigation conducted by Plaintiffs' undersigned attorneys, which included, among other things, review and analysis of: (1) documents filed with the United States Securities and Exchange Commission ("SEC") by Petróleo Brasileiro S.A.-Petrobras ("Petrobras" or the "Company") and its wholly-owned subsidiaries Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF"); (2) press releases and reports issued by and disseminated by Petrobras; (3) deposition testimony, proffers, criminal complaints and other evidence submitted by Brazilian authorities in connection with "Operation Car Wash" (discussed below); (4) international and domestic media coverage of Petrobras; (5) securities analyst reports regarding Petrobras; and (5) other publicly available information concerning Petrobras. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.       **NATURE OF ACTION**

1.      This action is brought pursuant to the Securities Exchange Act of 1934 (the ("Exchange Act") and the Securities Act of 1933 (the "Securities Act").  Plaintiffs purchased or otherwise acquired the securities of Petrobras, including debt securities issued by PifCo and PGF, between August 19, 2010 and May 13, 2015, inclusive (the "Relevant Period").

2.      Plaintiffs' Exchange Act claims allege that certain of the defendants engaged in a fraudulent scheme that artificially inflated the price of Petrobras securities, including the debt

securities issued by PifCo and/or PGF, during the Relevant Period.  Plaintiffs' Exchange Act claims are brought in connection with Petrobras debt securities.

3.     Plaintiffs' Securities Act claims are based solely on strict liability and negligence, and not upon any reckless or intentionally fraudulent conduct by or on behalf of Defendants (as defined below in ¶42).  These claims do not allege, arise from, or sound in, fraud.  Plaintiffs specifically disclaim any allegation of fraud, scienter, or recklessness with respect to their Securities Act claims.

4.     Plaintiffs' Securities Act claims are brought in connection with certain debt securities issued by PifCo and/or PGF pursuant to two public offerings registered in the United States.  In a debt offering on or about May 15, 2013 (the "2013 Offering"), PGF sold approximately $11 billion in notes at six sets of interest rate and maturity terms (the "2013 Notes").  PGF sold approximately $8.5 billion in notes at six sets of interest rate and maturity terms (the "2014 Notes") in a second debt offering on or about March 11, 2014 (the "2014 Offering" and, together with the 2013 Offering, the "Offerings").  Plaintiffs purchased 2013 Notes and 2014 Notes directly from the Underwriter Defendants named herein in the 2013 Offering and 2014 Offering respectively.

5.     The claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information made by Defendants throughout the Relevant Period, concerning: (1) the value of Petrobras' assets; (2) the Company's periodic expenses and net income; (3) the Company's anti-bribery and anti-corruption policies; and (4) whether the Company suffered from material weaknesses in its disclosure controls and procedures and its internal controls over financial reporting.  When the truth about these matters was revealed

2

through a series of corrective disclosures, the market value of Petrobras, PifCo and PGF securities purchased by Plaintiffs declined sharply, causing Plaintiffs to suffer losses.

## II.    FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS

6.      This case revolves around a prolonged, pervasive, multi-billion dollar bribery and corruption scheme involving top Petrobras executives, major contractors, and corrupt officials of the Brazilian government (which is Petrobras' controlling shareholder).  Beginning around 2005 and continuing into the Relevant Period, the Company engaged in a scheme whereby contractors paid bribes to Petrobras executives and others in exchange for the award of lucrative oil and gas construction contracts.  Some of the bribes were passed on to Brazilian politicians and political parties.  Petrobras then paid the contractors inflated amounts under the contracts in order to repay them for the bribes.  According to a money launderer who participated in the scheme, and whose testimony has been central to the Brazilian government investigation, both Petrobras' CEO and the current President of Brazil (who was the Chairman of the Company from 2003 to 2010) knew of and understood the scheme.  When the fraud was finally revealed beginning in May 2014, it sent shock waves through the Brazilian government and economy, and caused Petrobras' market capitalization to plummet.

7.      Throughout the Relevant Period, the Company specifically, unequivocally and repeatedly denied that it was involved in any corrupt practices, claiming that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that the Company "is not involved in corruption."  These statements were material to investors who were concerned about the potential for impropriety given the close relationship between the Brazilian government and the Company.

8.      Furthermore, Petrobras capitalized its bribery and corruption-related payments, treating them as costs related to the development of oil and gas infrastructure and recording them

3

on the Company's balance sheet as representing part of the value of the acquired assets. Petrobras then used the bribery-inflated asset values in calculating depreciation expenses and net income. Yet, during the Relevant Period, Petrobras asserted that it prepared its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP") or International Financial Reporting Standards ("IFRS"), claiming that its assets had values equal to the reported costs incurred in their acquisition or construction.

9.     Petrobras' reported asset values were important information for Plaintiffs and other purchasers of the Petrobras, PifCo, and PGF securities because these metrics were understood to represent the fair value of the Company's fixed assets. Market participants including rating agencies, analysts and investors relied upon the accuracy of these figures.

10.     After months of delay, on April 22, 2015, Petrobras released its audited financial statements for 2014, in which it wrote off *$2.5 billion* in bribery and corruption-related payments that were incorrectly capitalized. The Company also announced an impairment charge of *$11.6 billion* on its Abreu e Lima and Complexo Petroquimico do Rio de Janeiro ("Comperj") refineries. Thus, it is clear that the value of key Petrobras assets were massively overstated. It is not, however, clear whether these adjustments accurately capture the full extent of the overstatement and the reasons for it. None of the Board's independent members voted to affirm the audited financial statements, citing limitations on the information they were provided with, the time they were given to review it, and their concerns about the methodology used in analyzing the writedown. One stated that his meetings with management "were not sufficient to convince me that the balance sheet of Petrobras reflects accurately the financial reality of the Company."

11.     Throughout the Relevant Period, Petrobras issued public statements, including financial statements filed with the SEC, setting forth, among other things: (1) the Company's asset values; (2) the Company's periodic expenses and net income; (3) statements regarding the Company's anti-corruption policies and practices; and (4) certifications that the Company did not suffer from a material weakness in its disclosure controls and procedures or its internal controls over financial reporting.

12.     These statements were false, in that: (1) the Company's asset values had been inflated by the fraudulent practice of incorporating bribe and corruption-related expenses to contractors when capitalizing asset values on the Company's balance sheet, violating GAAP and IFRS; (2) the Company's expenses were understated and its income overstated due to its practice of capitalizing, rather than expensing, bribe and corruption-related expenses; (3) the Company was involved in corrupt practices and did make payments to political candidates; and (4) the Company suffered from material weaknesses in its disclosure controls and internal controls over financial reporting.  As a result of these false statements and omissions, the prices of Petrobras securities were artificially inflated during the Relevant Period.

13.     As a result of Defendants' materially false and/or misleading statements and omissions: (1) Petrobras, PifCo, and PGF securities traded at artificially inflated prices during the Relevant Period; and (2) Plaintiffs purchased those securities at artificially inflated prices. When the truth about these matters became known to investors, the price of Petrobras, PifCo, and PGF securities fell.  These price declines caused significant losses and damages to Plaintiffs.

### III.    PARTIES

#### A.    PLAINTIFFS

14.    **Plaintiff Lord Abbett Investment Trust – Lord Abbett Short Duration Income Fund**: Lord Abbett Investment Trust is an open-end management investment company registered under the Investment Company Act of 1940 (the "Investment Company Act"). The trust was organized as a Delaware statutory trust on August 16, 1993, with an unlimited number of outstanding shares of beneficial interest.  The trust has twelve funds or series, including Lord Abbett Short Duration Income Fund.

15.    **Plaintiff Lord Abbett Investment Trust – Lord Abbett Inflation Focused Fund**: Lord Abbett Investment Trust is an open-end management investment company registered under the Investment Company Act.  The trust was organized as a Delaware statutory trust on August 16, 1993, with an unlimited number of outstanding shares of beneficial interest.  The trust has twelve funds or series, including Lord Abbett Inflation Focused Fund.

16.    **Plaintiff Lord Abbett Global Fund, Inc. – Lord Abbett Emerging Markets Currency Fund**: Lord Abbett Global Fund Inc. is an open-end management company registered under the Investment Company Act and was incorporated under Maryland law on February 23, 1988.  Lord Abbett Global Fund Inc. has four funds or series, including Lord Abbett Emerging Markets Currency Fund.

17.    **Plaintiff Lord Abbett Passport Portfolios PLC – Lord Abbett Short Duration Income Fund**: Lord Abbett Passport Portfolios PLC is an open-ended umbrella type investment company incorporated under Irish law on October 17, 2013, and authorized under European law to conduct undertakings for the collective investment in transferable securities ("UCITS").  Lord Abbett Passport Portfolios PLC has six investment portfolios, including Lord Abbett Short Duration Income Fund, referred to herein as "Lord Abbett Short Duration Income UCITS."

18.     Plaintiffs made purchases of 2011 Notes (CUSIP 71645WAT8), 2012 Notes (CUSIP 71645WAU5), 2013 Notes (CUSIPs 71647NAD1 and 71647NAE9), and 2014 Notes (CUSIP 71647NAJ8) at artificially inflated prices during the Relevant Period and suffered damages thereby.  At the time Plaintiffs purchased these securities, Plaintiffs did so in reliance on the Petrobras public statements discussed in § IX, *infra*.  The 2011 Notes, 2012 Notes, 2013 Notes, and 2014 Notes purchased by Plaintiffs are held in custodial accounts, whose custodians participate in the DTC system.

B.     SECURITIES ACT DEFENDANTS

1.     The Company

19.     Defendant Petrobras is a corporation organized under Brazilian law.  Its principal executive offices are located at Avenida República do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil.  Petrobras also has an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.

20.     Defendant PGF is a wholly-owned finance subsidiary of Petrobras incorporated in The Netherlands.  Its principal executive offices are located at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.  Petrobras unconditionally guaranteed PGF's publicly issued debt.

21.     PifCo was a wholly-owned finance subsidiary of Petrobras.  Between the beginning of the Relevant Period and August 9, 2013, PifCo was incorporated in the Cayman Islands with its principal executive offices located at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box I 034GT-BWI, George Town, Grand Cayman, Cayman Islands.  On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with principal executive offices at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013, certain assets and liabilities of PifCo were spun off to Petrobras.  On February 12, 2014, PGF acquired

7

the outstanding shares of PifCo as an initial step for the merger of PifCo into PGF.   On December 29, 2014, the merger of PifCo into PGF was completed and PifCo's separate corporate existence was extinguished.  All allegations against PifCo are made against PGF as the corporate successor of PifCo.  Petrobras unconditionally guaranteed PifCo's publicly issued debt.

### 2.      CEO Gabrielli

22.      Defendant José Sergio Gabrielli de Azevedo ("Gabrielli") served as Chief Executive Officer ("CEO") of Petrobras during the Relevant Period, and signed the 2009 and 2010 Forms 20-F.  Gabrielli resigned as CEO on or around January 23, 2012.

### 3.      The Officer and Director Defendants

23.      Defendant Maria das Graças Silva Foster ("Foster") served as CEO of Petrobras during the Relevant Period, beginning on or around February 13, 2012, and signed the prospectus included in the 2012 Registration Statement, as well as the 2011, 2012, and 2013 Forms 20-F.  Foster resigned as CEO on or around February 4, 2015.  Before becoming CEO, Defendant Foster served as director of the Company's gas and energy business division.

24.      Defendant Almir Guilherme Barbassa ("Barbassa") served as Chief Financial Officer ("CFO") of Petrobras during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, 2012, and 2013 Forms 20-F.

25.      Defendant Daniel Lima de Oliveira ("Oliveira") served as CEO and Chairman of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, and 2012 Forms 20-F.

26.      Defendant José Raimundo Brandão Pereira served as a Director of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

8

27.     Defendant Sérvio Túlio da Rosa Tinoco ("Tinoco") served as CFO of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, and 2012 Forms 20-F.

28.     Defendant Paulo José Alves served as the Chief Accounting Officer of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

29.     Defendant Gustavo Tardin Barbosa served as CEO and Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

30.     Defendant Alexandre Quintão Fernandes served as CFO and Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

31.     Defendant Marcos Antonio Zacarias served as a Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

32.     Defendant Cornelis Franciscus Jozef Looman served as a Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

33.     Defendant Theodore Marshall Helms ("Helms") serves as the authorized U.S. Representative for Petrobras and PGF, and served as the authorized U.S. Representative for PifCo during the Relevant Period.   Helms signed the prospectus included in the 2012 Registration Statement.

34.     The defendants listed in ¶¶23-33 are referred to as the "Section 11 Officer and Director Defendants."

35.     The defendants listed in ¶¶23-32 are referred to as the "Section 15 Officer and Director Defendants."

### 4. The Underwriter Defendants

36.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes and 2014 Notes as set forth in the table below.  J.P. Morgan maintains its principal place of business in New York City.

37.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes as set forth in the table below.  Morgan Stanley maintains its principal place of business in New York City.

38.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as an underwriter and joint bookrunner of the 2013 Notes offering as set forth in the table below.  Merrill Lynch maintains its principal place of business in New York City.

| Defendant | Role(s) | Offerings |
|---|---|---|
| J.P. Morgan | Underwriter<br>Joint Bookrunner | 2013 Notes<br>2014 Notes |
| Morgan Stanley | Underwriter<br>Joint Bookrunner | 2013 Notes |
| Merrill Lynch | Underwriter<br>Joint Bookrunner | 2013 Notes |

39.     The defendants listed in ¶¶36-38 are referred to herein as the "Underwriter Defendants."

40.     Petrobras, PGF, the Section 11 Officer and Director Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

### C.   EXCHANGE ACT DEFENDANTS

41.     Defendants Foster, Gabrielli and Barbassa (described above in ¶¶22-24) are collectively referred to herein as the "Individual Defendants," and together with defendants Petrobras and PGF, are collectively referred to herein as the "Exchange Act Defendants."

42.     The defendants described above in ¶¶19-41 are collectively referred to herein as the "Defendants."

## IV.   JURISDICTION AND VENUE

43.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77(k), 77(1), and 77(t), and Sections 10(b), 18 and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

44.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

45.     This Court has personal jurisdiction over each of the Defendants named in this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), and/or N.Y. CPLR § 302.  Each of the Defendants either maintains a continuous presence within this District or participated in transactions at issue in this Action within this District.

46.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Petrobras maintains an office in this District, sponsors ADS that are listed on an exchange located in this District, and certain of the acts alleged herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District.  All of the registered public offerings at issue in this Action were carried out in this District, 23 debt securities currently

outstanding issued by PifCo or PGF are registered with an exchange located in this District, and 19 debt securities issued by PifCo or PGF during the Relevant Period (including the re-opening of two prior issues) are registered with an exchange located in this District.  Furthermore, the Underwriter Defendants are headquartered in this District.

47.    Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets, in committing the acts complained of herein.

## V.    RELEVANT SECURITIES

48.    Petrobras was incorporated in 1953 to conduct the Brazilian government's hydrocarbon business.  While the Company was opened to private equity ownership in the late 1990s, the Brazilian government still owned 28.67% of its outstanding capital stock and 50.26% of its voting shares as of December 31, 2013.  It is involved in hydrocarbon-related businesses including exploration, development, production, refining, logistics, transportation, and trading, as well as production of biofuels.

### A.    PETROBRAS DEBT – THE 2011 AND 2012 NOTES

49.    On December 11, 2009, Petrobras and PifCo filed a registration statement on Form F-3ASR (the "2009 Registration Statement"), whereby they registered "an indeterminate amount of securities for offer and sale from time to time at indeterminate offering prices."  The 2009 Registration Statement states that "[w]e have agreed that New York law governs the indenture and the debt securities.  We have filed a copy of the Petrobras indenture and PifCo indenture with the SEC as exhibits to our registration statement.  We have consented to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the City of New York, New York[.]"

50.     On January 21, 2011, PifCo filed a prospectus supplement on Form 424B2 (the "2011 Prospectus" and together with the 2009 Registration Statement, the "2011 Offering Documents") for the offer and sale of $6 billion in debt securities in three different series of notes, pursuant to the 2009 Registration Statement.

51.     Pursuant to the 2011 Offering Documents, Petrobras and PifCo offered three series of notes: (1) $2.5 billion of notes paying 5.375% due in 2021 (CUSIP 71645WAR2); (2) $2.5 billion of notes paying 3.875% due in 2016 (CUSIP 71645WAT8); and (3) $1 billion of notes paying $6.750% due in 2041 (CUSIP 71645WAS0) (collectively, the "2011 Notes").

52.     On February 3, 2012, PifCo filed a prospectus supplement on Form 424B2 (the "2012 Prospectus" and together with the 2009 Registration Statement, the "2012 Offering Documents") for the offer and sale of $7 billion in debt securities in four different series of notes, pursuant to the 2009 Registration Statement.

53.     Pursuant to the 2012 Offering Documents, Petrobras and PifCo offered four series of notes: (1) a $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 (CUSIP 71645WAR2); (2) a $1.25 billion re-opening of notes first offered on January 27, 2011 paying 6.750% due in 204l (CUSIP 71645WAS0); (3) $1.25 billion of notes paying 2.875% due in 2015 (CUSIP 71645WAV3); and (4) $1.75 billion of notes paying 3.500% due in 2017 (CUSIP 71645WAU5) (collectively, the "2012 Notes").

**B.     PETROBRAS DEBT – THE 2013 AND 2014 NOTES**

54.     On August 29, 2012, Petrobras, PifCo, and PGF filed a registration statement on Form F-3ASR (the "2012 Registration Statement"), whereby they again registered "an indeterminate amount of securities for offer and sale from time to time at indeterminate offering prices."   The 2012 Registration Statement states that, "We have agreed that New York law governs the indenture and the debt securities.   We have filed a copy of the Petrobras, PifCo and

PGF indentures as exhibits to our registration statement.  We have consented to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the City of New York, New York[.]"  The 2012 Registration Statement included a prospectus that expressly incorporated by reference the following documents, amongst others:

      a)    the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011, filed with the SEC on March 30, 2012, and its amendment on Form 20-F/A, filed with the SEC on July 9, 2012;

      b)    the Petrobras Report on Form 6-K filed with the SEC on August 10, 2012, containing financial information for the six-month periods ended June 30, 2012 and 2011; and

      c)    "Any future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus . . . ."

55.    On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 (the "2013 Prospectus" and together with the 2012 Registration Statement, the "2013 Offering Documents") for the offer and sale of $11 billion in debt securities in six different series of notes, pursuant to the 2012 Registration Statement.

56.    Pursuant to the 2013 Offering Documents, Petrobras and PGF offered six series of notes: (1) $1.25 billion of notes paying 2.00% due in 2016 (CUSIP 71647NAC3); (2) $2 billion of notes paying 3.00% due in 2019 (CUSIP 71647NAB5); (3) $3.5 billion of notes paying 4.375% due in 2023 (CUSIP 71647NAF6); (4) $l.75 billion of notes paying 5.625% due in 2043 (CUSIP 71647NAA7); (5) $1 billion of floating-rate notes due in 2016 (CUSIP 71647NAD1); and (6) $1.5 billion of floating-rate notes due in 2019 (CUSIP 71647NAE9).

57.     The 2013 Offering took place within the United States.  The 2013 Prospectus stated that, "No action has been or will be taken in any jurisdiction other than the United States by PGF or any underwriter that would, or is intended to, permit a public offering of the notes, or possession or distribution of this prospectus supplement or any other offering material, in any country or jurisdiction where action for that purpose is required."

58.     On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 (the "2014 Prospectus" and together with the 2012 Registration Statement, the "2014 Offering Documents") for the offer and sale of $8.1 billion of debt securities in six different series of notes, pursuant to the 2012 Registration Statement.

59.     Pursuant to the 2014 Offering Documents, Petrobras and PGF offered six series of notes: (l) $1.6 billion of notes paying 3.250% due in 2017 (CUSIP 71647NAG4); (2) $1.5 billion of notes paying 4.875% due in 2020 (CUSIP 71647NAH2); (3) $2.5 billion of notes paying 6.250% due in 2024 (CUSIP 71647NAM1); (4) $1 billion of notes paying 7.250% due in 2044 (CUSIP 71647NAK5); (5) $1 billion of floating-rate notes due in 2017 (CUSIP 71647NAJ8); and (6) $500 million of floating-rate notes due in 2020 (CUSIP 71647NAL3).

60.     The 2014 Offering took place within the United States.  The 2014 Prospectus stated that, "No action has been or will be taken in any jurisdiction other than the United States by PGF or any underwriter that would, or is intended to, permit a public offering of the notes, or possession or distribution of this prospectus supplement or any other offering material, in any country or jurisdiction where action for that purpose is required."

61.     The 2011 Notes, 2012 Notes, 2013 Notes, and 2014 Notes are hereinafter collectively referred to as the "Petrobras Notes."   The Petrobras Notes are fully and unconditionally guaranteed by Petrobras.

**VI.    PLAINTIFFS PURCHASED PETROBRAS SECURITIES IN DOMESTIC TRANSACTIONS**

62.    During the Relevant Period, Plaintiffs and/or agents acting on Plaintiffs' behalf purchased Petrobras securities on a US exchange, and made purchases of Petrobras securities that were settled within the US, such that irrevocable liability for those purchases was incurred within the US or title to those securities passed within the US.  To the extent that any of Plaintiffs' purchases of Petrobras securities were settled outside the US, Plaintiffs do not bring claims in connection with those transactions.

63.    Plaintiffs purchased Petrobras Notes directly from the Underwriter Defendants in both the 2013 Offering and the 2014 Offering, as indicated in the table below.  Furthermore, Plaintiffs made additional purchases in the United States of Petrobras Notes, including 2013 Notes and 2014 Notes traceable to the 2013 Offering and 2014 Offering respectively.  All of the Plaintiffs' purchases, including those not made in the 2013 Offering and 2014 Offering, were cleared through the  Depository Trust Company ("DTC"), a New York corporation.

64.    The table below lists Plaintiffs' purchases of 2013 Notes and 2014 directly from the Underwriter Defendants in the 2013 Offering and the 2014 Offering.

| Plaintiff | CUSIP | Date | Units | Unit Price | Counterparty |
|---|---|---|---|---|---|
| Lord Abbett Emerging Markets Currency Fund | 71647NAJ8 | 03/10/14 | 3,000,000 | $100.00 | J.P. Morgan Securities LLC |
| Lord Abbett Inflation Focused Fund | 71647NAD1 | 05/13/13 | 700,000 | $100.00 | Merrill Lynch, Pierce, Fenner & Smith Inc. |
| Lord Abbett Inflation Focused Fund | 71647NAE9 | 05/13/13 | 1,000,000 | $100.00 | Morgan Stanley & Co. LLC |
| Lord Abbett Inflation Focused Fund | 71647NAJ8 | 03/10/14 | 1,000,000 | $100.00 | J.P. Morgan Securities LLC |
| Lord Abbett Short Duration Income Fund | 71647NAD1 | 05/13/13 | 24,300,000 | $100.00 | Merrill Lynch, Pierce, Fenner & Smith Inc. |

| Plaintiff | CUSIP | Date | Units | Unit Price | Counterparty |
|-----------|-------|------|-------|-----------|--------------|
| Lord Abbett Short Duration Income Fund | 71647NAE9 | 05/13/13 | 34,000,000 | $100.00 | Morgan Stanley & Co. LLC |
| Lord Abbett Short Duration Income Fund | 71647NAJ8 | 03/10/14 | 31,000,000 | $100.00 | J.P. Morgan Securities LLC |

## VII.   SUMMARY OF SUBSTANTIVE ALLEGATIONS

### A.   BACKGROUND OF PETROBRAS

65.     Petrobras is an integrated oil and gas company that was incorporated in 1953 to conduct the Brazilian federal government's hydrocarbon activities. The Company carries out crude oil and natural gas production and refining activities on behalf of the Brazilian government.  Petrobras is one of the largest companies in Latin America, and as of December 31, 2014, the Brazilian federal government owned 50.26% of Petrobras' voting shares.

66.     Petrobras' operations account for the majority of Brazil's oil and gas production. Petrobras operates substantially all of the refining capacity in Brazil and participates in most aspects of the Brazilian natural gas market. The Company's revenue-generating activities are organized into five business segments: (1) exploration and production; (2) refining, transportation and marketing; (3) gas and energy; (4) distribution; and (5) international. The Company has additional non-revenue generating divisions, such as the services division. During the Relevant Period, the services division was responsible for designing and overseeing the construction and development of Petrobras' large-scale capital projects, including the construction of new refineries.

67.     Petrobras has stated in SEC filings that its "most important tangible assets" were reported on its balance sheet as property, plant, and equipment ("PP&E").  During the Relevant Period, PP&E constituted the majority of the Company's assets.

**B.     A BRIBERY SCANDAL ENGULFS PETROBRAS**

**1.     Operation Car Wash Uncovers An Enormous Bribery And Corruption Scheme Implicating Top Petrobras Officials**

68.     In or about July 2013, Brazilian federal police launched a secret operation code-named "*Lava Jato*," or "Car Wash."   Operation Car Wash focused on a scheme involving a career criminal and money launderer named Alberto Youssef ("Youssef"), and was named after a gas station used by Youssef to launder cash.   As the investigation progressed, each new phase was given its own colorful code name, such as "Dolce Vita," "Bidone," "My Way," and "Doomsday," though "Car Wash" is used in the press—and this Complaint—to refer to the total operation.   On or about March 20, 2014, after several months of the Operation Car Wash investigation, Brazilian police arrested Paulo Costa ("Costa"), a director of Petrobras' refining division, based on documentation linking Costa to another person implicated in the money laundering scheme.   When the police raided Costa's home, they found a cache of R$380,000 in Brazilian currency, $181,000 in U.S. currency, a $120,000 SUV, and his diary, in which he had written, "Rooting out corruption is the ultimate goal of those who have not yet come to power."

69.     Costa subsequently agreed to a plea deal from prosecutors, and has testified that he turned Petrobras' refining division into a slush fund for the Workers' Party, a Brazilian political party that has governed at the federal level in a coalition government with several other parties since 2003.   Former Petrobras executive Pedro Barusco ("Barusco") has quantified the amount paid to the Party, testifying before a Brazilian congressional hearing that the Workers' Party received up to $200 million in payments skimmed from Petrobras between 2003 and 2014.

70.     In his testimony, Costa testified that he started inflating budgets for new projects after he was promoted to oversee refining operations nearly a decade ago, accepting bribes equivalent to three percent (3%) of the value of the deals from the Brazilian construction

companies that obtained the contracts, and then handing over a portion of the money to the treasurer of the Workers' Party.   He also testified that this practice was widely known at Petrobras, and that different political parties had different fiefdoms within the Company, stating:

> Look, in regard to the Services Department, it was everyone, everyone knew, that they had a percentage of those contracts in the Supply area, of the 3%, 2% was to take care of the [Workers' Party].   Through the Services Department.   Other departments such as gas and energy, and exploration and production, were also [Workers' Party], and then you had [Workers' Party] in the Exploration and Production Department, [Workers' Party] in the Gas and Energy Department, and [Workers' Party] in the service area.   So, the common commentary inside the company was that, in that case, 3% was directly for, directly for the [Workers' Party]. . . . The International Department was designated for the [Brazilian Democratic Movement Party].   So, there were also funds that were kicked back to the [Brazilian Democratic Movement Party] in the International Department.

> \* \* \*

> I worked at this company for 35 years, 27 years of my, of my career, was spent in technical and management positions and I never had a blemish on my record during those 27 years.   If there were mistakes – and there were – they started from the time I became a director, due to involvement in groups, political ones, mainly, which, using the Prayer of Saint Francis over there, that it is in giving that you receive.   They used that a lot.   ***So, this political involvement that exists, that existed, afterwards when I left, I cannot say, but it was present throughout the executive board of Petrobras, and it is a blemish on the company . . . .***

(All emphasis added, unless otherwise noted.)

71.     Former Petrobras executive Barusco also made clear the pervasiveness of corruption, testifying that he had received bribes from contractors in exchange for inflated contracts as long as 18 years ago.

72.     In addition to inflating prices by 3% or more, the bribery scheme also effectively eliminated competitive bidding for large Petrobras projects by restricting contracts to a small group of Brazilian companies that operated as a cartel, thereby allowing Petrobras contractors to lock in inflated profits.   A May 8, 2015 BLOOMBERG BUSINESS article entitled "The Betrayal of Brazil" reported that, according to Barusco's testimony, when the cartel met in the São Paulo

offices of one of its members, the engineering firm UTC Engenharia, to develop plans to divide up contracts at inflated prices, a representative of Odebrecht S.A. secretly asked Petrobras to restrict bidding to cartel members, and Petrobras formally limited bidding to companies on the list of cartel members.  According to Costa's plea documents, the cartel was formed "with the object of frustrating the effective competitive bidding process for contracting."  He further stated that "due to the lack of effective competition [cartel contractor profits] always[] stretch[] to the limit the contracting enterprise allows."

73.     Petrobras contracting rules considered any contract bid that came between a range of 15% below the basic budget and up to 20% above it to be reasonable.  Due to the existence of the cartel scheme, however, cartel companies were able to routinely set their bids at close to the maximum allowed, as demonstrated by the following exchange in Youssef's testimony.

> Q: [H]ow did these companies arrive at the amounts in the contracts?  Petrobras has a reference value, you know, for contracts.  How did they arrive at this reference amount to not be too much higher or lower?  Do you know about this?
>
> A: Actually, Petrobras works with minus 15 and plus 20%.  They were always within this average.  Whenever they went beyond this limit, the director would call to negotiate.
>
> Q: Did the other companies participate in this negotiation or just the company that had provided the best proposal?
>
> A: Only the company that had provided the best proposal.
>
> Q: This reference value, then, was based on minus 15 or plus 20, didn't the companies know about this?
>
> A: No, they didn't.  Each one had to really prepare their quote properly to be able to participate in the  . . .
>
> Q: [C]an you tell me whether being in this cartel enabled these companies to set the price in their contracts close to the plus 20%?
>
> A: This is what was discussed with the director, ok?  The director called and said: "Look, this is above the price, it has to fit the limits.  I want this project to stay

within this level."  It can be done, it can.  It can't be done, it can't.  Then he'd call the second.

Q: But the second . . . as a rule, since the list was only negotiated among . . . ?

A: Normally, it never reached the second placed company.  Normally, always the first one got it.

Q: So we can conclude that, due to the existence of the cartel, the contracts executed by Petrobras were always executed at the maximum amount possible or close to it?

A: Or close to it.

74.     On April 15, 2014, then-CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's 2006 purchase of a refinery in Pasadena and allegations regarding bribery.  Petrobras paid $360 million for fifty percent of the refinery, even though its previous owner, Astra Oil, had paid only $42.5 million for it the previous year.  Costa has told investigators that he received $1.5 million from a lobbyist to aid in the purchase of the Pasadena refinery.  As part of her statement, CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts in which Costa could have participated.

75.     On or about October 9, 2014, recordings of Costa's testimony were released, in which Costa testified that bribes had been paid in connection with the award of contracts to Transpetro, a segment of Petrobras, implicating Sergio Machado ("Machado"), who was then the director of Transpetro.  Machado has since requested unpaid leave.

76.     Testimony and documents from contractors connected to the scandal have provided further evidence of the pervasiveness and far reach of the scheme.  For example, according to a November 24, 2014 article in GLOBO, Erton Medeiros Fonseca, a director of the contractor Galvão Engenharia who was arrested in connection with Operation Car Wash, has admitted to Brazilian police that he paid bribes to execute contracts with Petrobras under "effective threat of retaliation against contracts maintained by Galvão Engenharia S/A with

Petrobras."  A February 21, 2015 article in VEJA revealed that the president of contractor UTC Engenharia provided the Workers' Party with R$30 million in bribes, including R$10 million given to the re-election campaign of President Dilma Rousseff and over R$2 million in cash given to a former government minister to pay for living expenses.

77.     Petrobras has stated that "the payment scheme involved a group of 27 companies," who were part of a cartel, as well as an undisclosed number of companies outside the cartel that also paid bribes for overpriced contracts.  The Company's Board has imposed a temporary ban on contracts and bids from contractors linked to the scheme.  The blacklist includes some of Brazil's biggest contractors, such as Odebrecht S.A., Camargo Correa S.A., and Andrade Gutierrez S.A.  In December 2014, Brazil's comptroller general initiated cases against eight construction companies with ties to Petrobras.  The comptroller general announced on March 11, 2015, that it had opened cases against ten additional construction firms with Petrobras contracts: Alumini Engenharia S.A., GDK S.A., Promon Engenharia, Andrade Gutierrez, Fidens Engenharia, Sanko Sider, Odebrecht, Odebrecht Óleo e Gás, Odebrecht Ambiental, and SOG Óleo e Gás.  The cases may prevent these companies from signing new contracts and may lead to fines and other penalties.  Youssef has testified that the contractors, "especially the large ones, were hostage to this scheme because either they participated or they won no contracts."  In June 2015, Brazilian police arrested the heads of Odebrecht SA and Andrade Gutierrez.  After his arrest, Marcelo Odebrecht sent a handwritten note to his lawyers including the instruction, "destroy email drilling rigs."

78.     Multi-national corporations have also been implicated, including SBM Offshore ("SBM"); Maersk; and two Singaporean companies (Keppel Corp. and Sembcorp Marine).  According to Barusco, a former executive of ABB, a Swiss engineering group, was responsible

for organizing bribes from SBM, Alusa (a Brazilian construction company), and Rolls-Royce (the British corporation) to politicians and Petrobras executives.  Barusco admitted that he laundered approximately $100 million in bribes and that he personally received at least $200,000 from Rolls-Royce.  A network of Swiss bank accounts was used for some of these illegal payments, according to both Barusco and documents released by a Brazilian court.

79.    Petrobras had previously and repeatedly told investors that it had specifically investigated the SBM contracts and denied "vehemently" that any wrongdoing had occurred.  In a May 10, 2014 posting on its *Fatos e Dados* ("Facts and Data") blog, Petrobras stated that the Company "became aware of reports of alleged bribes to employees of the company, involving the firm SBM Offshore," for the first time in February 2014.  The Company reiterated this denial in a July 12, 2014 Facts and Data posting, stating, "[i]t must also be stressed that the investigations conducted by SBM Offshore found no evidence of improper payments."

80.    A Brazilian federal court has so far indicted about 40 individuals, including several dozen executives of construction companies, and fourteen persons are in custody while the investigation proceeds.  In addition, Brazil's public prosecutor's office has said that it seeks to investigate 49 politicians in connection with the scandal, including the speakers of both houses of the Brazilian Congress.

### 2.    An Independent Member Of The Petrobras Board Votes Against Approval Of The Company's 2013 Financial Statements

81.    Around the time that police began making arrests in the Operation Car Wash scandal, an independent member of the Petrobras Board noticed irregularities in the Company's financial reporting, and specifically its accounting for its refinery projects.  On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote, but also disclosed that:

Director Mauro Rodrigues da Cunha ["Cunha"] ***voted against the approval of the Financial Statements*** of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) ***lack of information and apparent accounting inadequacy of refinery investments***.

82.     According to a February 6, 2015 BLOOMBERG BUSINESS article, *Petrobras Independent Board Members Oppose CEO Choice*, Cunha, who was nominated to the Board by international funds, rejected the Company's 2013 earnings report because he was given only a few minutes to evaluate complex documents and because the accounting for refineries was inadequate.  He complained to a Brazilian regulator, writing, "[t]hey are among the world's most expensive refineries. . . .  I'm not comfortable with the absence of impairment."  Although it is not at this time clear whether Cunha thought that impairments were necessary as a result of bribery and corruption-related overcharges or some other factor (such as the significant cost overruns that had occurred), the Abreu e Lima and Comperj refineries whose accounting Cunha objected to were later revealed to be at the center of the corruption scandal.

83.     Cunha was removed by the Petrobras Board from a committee investigating the Pasadena and Abreu e Lima refineries on April 25, 2014, shortly after he raised his objections. He has lodged a complaint with Brazilian securities regulators questioning his removal and the independence of the committee.

### 3.     The Abreu e Lima Refinery, Comperj Petrochemical Complex And Other Major Projects Are Implicated In The Fraud

84.     Records from the Brazilian Federal Audits Court, which is known as the TCU, show that investigators detected widespread overcharging on contracts and irregular tendering practices at major Petrobras projects (including the Abreu e Lima refinery, the biggest single investment project in Petrobras' history) as early as 2009.  In a report that was delivered directly to Petrobras' Board, the TCU reported on these practices, criticized Petrobras for obstructing its

investigation by waiting until the last day of the investigation to deliver documents, and recommended stopping construction on the Abreu e Lima refinery until the irregularities were addressed.   The Petrobras Board overruled this recommendation.   Another of the Board's independent members, Silvio Sinedino, who represents Petrobras employees, told BLOOMBERG that, "The board ratifies the decisions previously made by the government.  The meetings are too fast, and don't allow for discussions to go deeper."   "The government doesn't want oversight," said Sinedino, adding that important financial information on projects is often provided only on the day of meetings and that government officials try to strong-arm the board.

85.     The TCU continued to flag irregularities in reports on the Abreu e Lima refinery for 2010, 2011, 2012, and 2013.   The TCU's findings were "a clear warning sign of bigger problems and likely corruption," Saulo Puttini, one of the auditing officials, told REUTERS. "What's happening now is not a surprise to us at all."   The cost of the Abreu e Lima refinery surged to over $18 billion from $4 billion, reportedly making it the most expensive refinery ever built.

86.     Brazilian opposition parties seized on the TCU's findings by establishing a committee to investigate Petrobras-related corruption.   Costa attended a meeting with ruling party representatives who made it clear that they opposed the investigation.  Costa then related to Gabrielli's Chief of Staff, who agreed that the investigation must be blocked.  At another meeting with party representatives, an R$10 million bribe was arranged to secure the assistance of a politician to stop the investigation.  Costa persuaded a cartel member working on the Abreu e Lima refinery to pay the bribe.

87.    The investigation nevertheless went forward, but was headed by a ruling party politician that had participated in the meetings with Costa.  The investigation concluded that the TCU audits identifying irregularities were flawed.

88.    Yet, on April 22, 2015, the Company announced a $3.4 billion impairment on the Abreu e Lima refinery.   In the minutes to a Petrobras Board meeting held that same day, Petrobras Board member Sinedino noted that, "[b]y the average maximum international cost [Abreu e Lima] should have a cost of US$25 thousand/capacity of refined barrel, and at [Abreu e Lima] we have US$81 thousand/capacity of refined barrel."

89.    The TCU flagged similar problems at the Comperj complex.  On October 8, 2010, FOLHA DE SÃO PAULO reported that the TCU had identified "signs of serious irregularities" in three contracts associated with Comperj, including overpricing, incorrect cost estimates, and anti-economic agreements with contractors.  Petrobras vigorously denied the TCU's findings.

90.    Later, in October, 2014, the TCU released documents indicating that Petrobras will spend $21.6 billion—60% more than the original budget—to complete the Comperj complex.  An internal Petrobras audit completed in November 2014 found that starting in April 2010, Petrobras acquired equipment to be used at the Comperj facility prior even to defining the refinery's business model and production structure.  As a result, Petrobras spent over R$1 billion on maintenance of gear that it did not ultimately need.  The Petrobras auditors also found irregularities in a major contract associated with Comperj, whereby three companies linked to the cartel were awarded an R$3.8 billion contract with no public competition.  The audit found that "management failures, planning and coordination issues in the enforcement of the project may have contributed to facilitate the occurrence of eventual criminal actions," linking Costa and other Petrobras executives suspected of criminal conduct to the Comperj contracts.  Costa has

said the contracts indicated as irregular by the audit at Comperj were approved by a panel of the Petrobras Board.  On April 22, 2015, the Company announced an $8.2 billion impairment on Comperj.

91.     According to an article in EPOCA, TCU auditors also identified "serious irregularities" in the billing processes and prices at the Presidente Getúlio Vargas Refinery ("Repar") in 2009, and recommended that Congress block payment of works at Repar, Abreu e Lima, Comperj, and another refinery.  This recommendation was approved by Congress but overruled by the President of Brazil.  In another audit in 2014, the TCU again identified irregularities and recommended that payment be suspended on seven contracts related to Repar.

92.     During the Relevant Period, however, the Company repeatedly denied the existence of these irregularities.  Petrobras represented to investors and the public that there were no irregularities in the contracting for these major projects and that it was in full compliance with its regulators.  For example, in a January 28, 2010 posting on its Facts and Data blog, the Company stated that:

> Petrobras reiterates that there are no irregularities in contracts relating to construction works at the Abreu e Lima Refinery (PE); modernization and adaptation of production at the Presidente Getúlio Vargas Refinery (REPAR/Paraná); construction of the Rio de Janeiro Petrochemical Complex (COMPERJ/Rio de Janeiro); and construction of the Barra do Riacho Terminal (Espírito Santo).  There are differences in the parameters used by TCU and by Petrobras, which resulted in different amounts in some contracts for the aforementioned works.

>                         *     *     *

> The Company collaborates systematically with oversight bodies, and where there are discrepancies, it seeks to clarify them.  This is what it has done in the case of these four projects.

93.     The next day, in a January 29, 2010 Facts and Data posting, Petrobras "reiterate[d] that there was no 'overbilling' or 'overpricing' . . . at the Abreu e Lima refinery works."

94.     Similarly, on October 8, 2010, in response to media reports that the TCU had found evidence of overpricing in Petrobras contracts, Petrobras stated on Facts and Data that, "Petrobras reiterates that there are no irregularities in the Rio de Janeiro Petrochemical Complex (Comperj). . . . There is no overbilling.  Petrobras reiterates that there are technical discrepancies between the methodologies used by the company and those used by the TCU."

### 4.     Petrobras' Most Senior Executives Knew Of The Fraud

95.     The persons involved in the fraud were senior executives whose knowledge may be imputed to Petrobras.  Costa was the former director of the Company's refining division, and in a January 9, 2015 cooperation statement he said that, "the Directors of the services, international and supply areas knew for sure the cartelization process[.]"  Barusco was a former high-level manager in the engineering and services division.  In addition, Nestor Cervero ("Cervero"), the former head of Petrobras' distribution subsidiary, has been arrested for corruption and money laundering for alleged crimes committed between 2006 and 2012, and sentenced to five years in prison.  Cervero held various positions at Petrobras and was its international director when the Company purchased the Pasadena Refinery that is believed to be implicated in the corruption scheme.  Jorge Zelada, whose was the director of the international division from 2008 to 2012, has also been arrested.  Prosecutors also are pursuing indictments against former CEO Gabrielli as well as former executive Renato Duque ("Duque") (former director of engineering and services).  Duque stamped, signed and referred to the Petrobras Board at least $2.67 billion in contracts for the Abreu e Lima refinery project at the heart of the investigation.

96.     Other top Petrobras executives also were involved in or otherwise knew of the fraud.  According to a December 12, 2014 article in the newspaper VALOR ECONÔMICO, between 2008 and 2009, former Petrobras executive Venina Velosa da Fonseca ("Velosa") repeatedly warned top Petrobras executives about corrupt acts and irregularities, to no avail.  For example:

a)      In 2008, when Velosa was working in the Supply department under Costa, she sent CEO Gabrielli a report about suspicious transactions in the Communications department.   Gabrielli established a commission to investigate the case, which found that the Communications department had received R$58 million for services that it never provided. Nonetheless, the director of Communications remained with the Company for another four years.

b)      In 2009, Velosa emailed Foster (who was then director of Gas and Power) regarding the Abreu e Lima refinery.  Velosa criticized dismissals of contractor bids, and found more than a hundred avoidable cost overruns that had increased the expense of the refinery by almost R$950 million.  In early 2010, she was reassigned to Singapore.

c)      On October 7, 2011, Velosa emailed Foster again about irregularities in the bidding process.  In this email, Velosa stated, "I would like to present part of the documents I have.  Part of it, I know you are aware of."

d)      On April 10, 2012, Velosa emailed José Carlos Cosenza, the Company's director of Supply (and who is now the head of an internal commission investigating the implications of Operation Car Wash) notifying him about financial malfeasance in the purchase and sale of a type of fuel for ships,

29

whereby contractors were buying fuel and selling it to Petrobras at higher-than-market-rate prices, as well as not delivering the amounts promised. Velosa da Fonseca estimated that losses could amount to 15% of the value of the oil and fuel cargo in Singapore. In May 2012, she gave a presentation at Petrobras' Rio de Janeiro offices on this subject. Since then, Costa has testified that there were bribes paid in connection with the Supply department's contracting of ships.

97.     On November 19, 2014, Petrobras removed Velosa from her position, citing non-compliance with internal rules. The next day, she wrote again to Foster regarding her ordeal over the past several years, stating, "Since 2008, my life has become a living hell. I found an initial money deviation scheme, within Communication and Supply. While fighting against it, I was threatened and harassed." She said that she had been intimidated by violence, with a gun pointed at her head and threats made against her daughters. She said that she has documents that she did not provide to the press out of respect for Petrobras. And she reiterated that she had taken these issues to Company authorities, in vain.

98.     Velosa provided further detail on her whistleblowing efforts in a December 21, 2014 interview with journalist Glória Maria for FANTÁSTICO, a newsmagazine:

Glória Maria – You have testified at the Prosecution Office, and you also provided several documents that would prove irregularities in Petrobras businesses. How long have you been making claims?

Velosa – Since the first time I noticed that there were irregularities in my area. This happened in 2008. Since 2008 I have been making these... I have been reporting problems to my superiors, and now is the peak as I provide this documentation to the Prosecution Office.

Glória Maria – What kind of irregularities you have found in Petrobras' contracts?

Velosa – There are several types. Irregularities in the payment for non-provided services, contracts that were apparently overpriced. Negotiations requesting

commissions to people who were negotiating and a series of issues that would breach the code of ethics and procedures of the company.

Glória Maria – What employees, what people in Petrobras, have you informed about these irregularities?

Velosa – All my superiors. I informed the executive manager and up to the president of the company.

Glória Maria – Can you give names?

Velosa – Certainly. Initially, in 2008, as executive manager, I informed the director at the time, Paulo Roberto Costa. I informed other directors, such as Graça[] Foster. In addition, at a different time, I informed my executive managers, José Raimundo Brandão Pereira and Abílio, who was my current executive manager. I also informed director Cosenza. He was director and was a colleague, as executive manager. I informed president Gabrielli. I informed everyone I thought that could do something to fight that process that was installing at the company.

The current Petrobras president, Graça[] Foster, she is a career employee in the company, where she has worked as gas and power director. Graça[] assumed as president in February 2012.

She replaced Sergio Gabrielli, who had been in this position since July 2005. In Petrobras flowchart, Paulo Roberto Costa appears, as leader of the Supply Department between 2004 and 2012. He signed a plea arrangement to tell what he knows in exchange to a reduction in his penalty. Today, he is under house arrest. The Supply director is currently José Carlos Cosenza. In the same sector, there is another executive manager, Abilio Paulo Pinheiro Ramos.

Another executive manager, José Raimundo Brandão Pereira, was removed in April this year.

Glória Maria – The current Petrobras president, Graça[] Foster, says that you sent an email, but that she did not understand what it was. Have you presented your claim by email or personally?

Velosa – I was with the president personally when she was gas and power director. At the time, we discussed the subject. I gave her the documents about the claim in the communication area. Afterwards, we... She had access to irregularities at the meetings with the executive directors.

[Velosa showed Fantástico an email she sent to Foster in October 2011]: "I would like to be there, talking to you, looking straight into your eyes so you could feel what I want to say, even if I am at risk of crying in front of you. I will write, even knowing that there is a possibility of you visiting the office of director Paulo Roberto and then having him question me what I was doing in your office. I will

31

talk in the name of the woman that demands respect, and who will fight to the end, so one day my daughters will never say: she got tired, she gave up mid-way."

99.    In a December 12, 2014 Facts and Data posting, Petrobras claimed that it "took all necessary measures to clarify the facts cited in [Velosa's] stories," and touted its internal committees of investigation and internal controls.

100.    Youssef, the smuggler-turned-money-launderer at the center of Operation Car Wash, claims that Brazilian President Dilma Rousseff, who was the chairwoman of the Petrobras Board from 2003 to 2010, also knew of the kickbacks.  He also stated in an October 3, 2014 plea document that:

> [H]e reaffirms that the high levels of government had knowledge; ***THAT when asked about the actions of the directors of Petrobras, he explained that the Presidency of the state run company had knowledge of the facts***; THAT he remembers a situation in which there was a given situation [sic] in which there was a given process related to the hiring of marketing services for Petrobras and that it was interrupted due to irregularities; ***THAT in one of these "parallel acts," the deponent was given the task of paying these expenses for the participants as a result of a direct order by SERGIO GABRIELLI, then president, who had passed on the order from then Director PAULO ROBERTO COSTA[.]***

101.    During the Relevant Period, Costa, Duque, Cervero, Foster, Barbassa and Gabrielli each sat on Petrobras' Executive Board, which exercised oversight over the Company's most important assets and investments.  According to a February 6, 2013 Petrobras Form 6-K, Executive Board meetings were "held twice weekly to focus on the physical and financial monitoring of the principal projects in our investment plan."  Furthermore, Petrobras' bylaws indicate that the balance sheets and financial statements which are approved by the Audit Board are "prepared by the Board of Executive Officers."

32

### 5.      Petrobras Is Subject To Far-Ranging Investigations

102.    On October 27, 2014, Petrobras issued a press release entitled "Internal steps taken by Petrobras in response to 'Lava Jato Operation.'"  The Company noted that it was taking certain steps in response to the developing investigation, including:

> [S]ign[ing] contracts with two independent investigation companies, a Brazilian and an American, with the aim of examining the nature, extension and impacts of the actions that might have been performed against the Company in the context of what ha[s] been said by former Director Paulo Roberto Costa. These companies will also analyze correlated facts and circumstances that might have material impact over the Company's business.

103.    Many other investigations in addition to the criminal investigation have been initiated.  On November 24, 2014, before the markets opened, Petrobras issued a press release announcing that the Company was under investigation by the SEC.  That same day, news reports circulated that Brazilian police had raided the offices of construction and engineering firms linked to the bribery scheme, seizing documents and carrying out arrests.

104.    On December 16, 2014, Brazilian prosecutors announced that they requested that the bank accounts of Defendant Gabrielli and several other former Petrobras executives be frozen.

105.    Brazil's securities regulator is investigating whether top Petrobras executives breached their fiduciary duties to protect the Company and its investors.  While the regulator did not name specific persons, officials with fiduciary duties would include the CEO, CFO, heads of exploration and production, services and engineering and refining and supply, and members of the board of directors.

106.    On January 29, 2015, Brazilian prosecutors asserted that the kickback scheme involved at least $800 million in bribes and other illegal funds, though they expected that figure to grow.  As of that date, the investigation had targeted more than 230 businesses and resulted in

charges against 86 people, as well as the recovery of about $170 million.  Just a few days later, on February 5, 2015, the police conducted "Operation My Way," executing 62 warrants to arrest and question suspects, freeze assets, and seize evidence.  As of May 4, 2015, the investigation has led to a total of 97 indictments.  Investigators with Brazil's Finance Ministry say that they have identified as much as $17 billion of suspicious activity that may be linked to the scandal.

107.    Prosecutors are currently investigating at least 49 politicians from 6 political parties, including the heads of both houses of Congress and a former energy minister, in connection with the scheme.

108.    Brazilian securities regulators have also announced a separate investigation into whether former Petrobras Board members misled investors regarding Petrobras' fuel pricing policy by approving debt targets as part of Petrobras' 2014-2018 business plan but then forcing the company to pursue a fuel pricing policy that made it unlikely that it would be able to meet those goals.

### C.    PETROBRAS' AUDITOR REFUSES TO APPROVE ITS FINANCIAL STATEMENTS FOR THE THIRD QUARTER OF 2014 DUE TO CONCERNS OVER THE BRIBERY SCHEME

109.    On November 13, 2014, Petrobras disclosed that it would have to delay its earnings results for the third quarter of 2014 because its auditor, PricewaterhouseCoopers ("PwC"), would not approve those statements due to concerns over the impact of the bribery scheme.  In response to this partial disclosure of the inadequacy of Petrobras' internal controls and the unreliability of its financial statements, numerous securities issued by Petrobras, PifCo, and PGF dropped sharply in value.

110.    The very next day, on November 14, 2014, before trading opened, Petrobras disclosed that it would "release its third quarter 2014 financial statements, *without a review by its Independent Auditors*."  Petrobras further noted that:

34

In light of the ongoing investigations, it is currently not possible for the Company to determine an estimated date for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

111.    On January 27, 2015, Petrobras released its delayed unaudited financial statements for the third quarter 2014.  The company acknowledged the need to make revisions to fixed asset values in its financial statements to reflect overpayments tied to past misconduct, stating:

> These consolidated interim financial statements and notes to the financial statements have not been reviewed by independent auditors and reflect management's best judgment in fairly presenting the Company's financial position in light of facts known to management and based on documentation available as of the current date, ***except for errors in the carrying amount of certain property, plant and equipment, which could not be corrected by the Company as of the date of these financial statements, as set out in note 3.***
>
> These consolidated interim financial statements have been prepared in accordance with IAS – 34 Interim Financial Reporting, as issued by the International Accounting Standards Board (IASB), ***except for the errors mentioned above and further discussed in note 3.***

Petrobras, however, failed to provide any clarity about the magnitude of these error and the adjustments that would be required.

112.    On January 29, 2015, Moody's Investor Service ("Moody's") announced that it was downgrading all Petrobras debt ratings, including a downgrade of the Company's senior unsecured debt to Baa3 from Baa2, stating that, among other things, "[t]he rating actions reflect concerns about corruption investigations and liquidity pressures that might result from delays in delivering audited financial statements[.]"  The following month, on February 24, 2015, Moody's announced that it was further downgrading all Petrobras debt ratings, including downgrading the Company's senior unsecured debt to Ba2, which is a speculative grade – commonly known as "junk" – rather than investment grade rating.

### D.   PETROBRAS ADMITS THAT THE BRIBERY SCHEME CAUSED ITS ASSET VALUATIONS TO BE INFLATED

113.   On November 17, 2014, Petrobras hosted a conference call for analysts and investors.  During that call, the Company's CFO, Barbassa, acknowledged that the Company could need to write down asset values to eliminate fraudulently-incurred bribery and corruption-related payments that should not have been capitalized, and admitted that property, plant and equipment ("PP&E") valuations "should not include values, we try not [sic] a fair value for that good or service."  When an analyst asked him how fair value should be calculated, he said, "Well, the way we see this now, we would deduct from it any amount that could be linked to bribery of any sort, any excess of price that would have been charged."

114.   Also on this call, CEO Foster admitted that, "[y]ou have an obligation to write off from the asset a cost related to corruption.  So the asset can give us the best return possible.  But still, if there is a cost related to corruption in the value of that asset, even if the asset can pay off that cost, you have an obligation to write off that cost, you have to discount that cost."  She stated that:

> In light of the accusations and investigations of [O]peration Car Wash . . . Petrobras is not able to publish its 3Q14 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements.
>
> A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th Federal Court of Paraná, revealed information that may lead to possible adjustments in the financial statements of our Company.
>
> Because of these depositions, therefore, *we need more time to make any possible adjustments to the financial statements*. More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and *we need more time as it is fundamentally important to improve our internal controls*.

115.    During the question-and-answer portion of the call, the following exchange

occurred between CFO Barbassa, CEO Foster, and an analyst:

> [**Analyst**]: [I]f we suppose[] . . . [BRL] 5 billion of overprice in the construction
> of [an asset], how would this be recognized in the balance sheet of the Company?
> What are the main line items that would be impacted?
>
> **CFO Barbassa**: The adjustment that could be impacted if the accusations are
> proven to be true would refer to adjustments at fair price of the PP&E that was
> acquired. . . . In this case, ***this value should be removed from PP&E line item
> [adjusted] value . . . .***
>
> *              *              *
>
> **CEO Foster**: As for the amounts that we would be writing down in terms of our
> results, our official reference are the depositions made in court.  This was what
> the judges are calling evidence, temporary evidence. So, in this case, we have a
> schedule of activities, and we have deadlines to each one of these activities.
>
> For example, there is definition of criteria to measure the effects of losses caused
> by fraud. In here, ***in the objective, in material fashion, our reference will be the
> depositions made so far***, the evidence provided that will be submitted to
> Petrobras by the federal police. ***We will then use this evidence to have our
> write-downs, and to the write-downs year after year*** regarding companies A, B,
> C or D that we might have contracted.

116.    When Petrobras issued its unaudited financial statements for the third quarter of

2014 on January 27, 2015 (which were incorporated in the Company's Form 6-K filing with the

SEC on January 28, 2015).  In this filing, Petrobras admitted that the corruption scandal caused

the valuations of its assets to be improperly inflated, and that writedowns reflecting the true

value of the assets were both necessary and forthcoming, stating that:

> [T]he Company believes that amounts related to the misconduct by third parties
> were capitalized as part of the historical cost of its [PP&E] and are still part of
> their carrying amount.  However, those costs should not have been capitalized.
> The Company believes it is necessary to correct the amounts related to the
> misconduct that were capitalized.

Petrobras did not, however, write down its asset valuations or provide investors with an estimate

of the size of the forthcoming writedowns.

117.    Under pressure from the chairman of the Board, who is close to Brazil's ruling Workers' Party, Petrobras abandoned an initial decision to include such writedowns in its financial statements for the third quarter of 2014.  After first deciding to take the writedown, the Board reversed itself under pressure from Chairman and former Finance Minister Guido Mantega.  A source in Brazil has told REUTERS that "[e]ssentially the government didn't want the writedowns to be interpreted as totally related to corruption."

118.    Petrobras' January 28, 2015 financial statements contained a letter from CEO Foster concerning the corruption scandal and the overstatement of fixed asset values.  The letter stated in part:

> As is widely known, Petrobras is facing a unique moment in its history. In March 2014, the "Operation Lava Jato", triggered by the Brazilian Federal Police to investigate alleged money-laundering crimes, reached Petrobras through the arrest of the company's former Downstream Director, Paulo Roberto Costa, on charges of corruption, embezzlement, among other offenses.

> On November 13th, 2014 as a result of the facts and proofs obtained in the "Operation Lava Jato" Petrobras decided to postpone the release of its third quarter 2014 financial results.  *In short, the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments.*

> Consequently we have concluded that it is impracticable to correctly quantify these improperly recognized values, since the payments were made by external suppliers and cannot be traced back to the company's accounting records.

> Given the impracticality of identifying the improper payments correctly, completely and definitely, and the need to rectify this error, Petrobras considered two approaches: (1) the difference between the fair value of each asset appraised, and its book value; (2) the quantification of the price overrun related to illegal practices, using the information, numbers and dates revealed in the testimonials and plea bargaining of the "Operation Lava Jato".

119.    The letter went on to describe the first of these approaches, namely, comparing the appraisal and book values of the assets on the Company's balance sheet.  Significantly, the

letter disclosed that approximately **one third** of the Company's fixed assets were based on contracts with companies linked to the bribery scheme:

> The appraised assets represent R$ 188.4 billion, or approximately 1/3 of the company's total fixed assets (R$ 597.4 billion) and were based on contracts signed between Petrobras and the companies mentioned in "Operation Lava Jato" from 2004 to April 2012.
>
> The evaluation was carried out by global firms internationally recognized as independent evaluators for 81% of the assets appraised. The analysis of the remaining 19% was conducted by the technical teams of Petrobras, employing full methodological consistency and the same assumptions as the work carried out by the independent evaluators.
>
> However, the maturity acquired throughout this appraisal process demonstrated to us that this methodology was not an adequate proxy for the unlawful values paid, as this adjustment would also include amounts originated from different situations, which are impossible to be individually quantified,  such as changes in the economic and financial variables (exchange rate, discount rate, risk metrics and cost of capital); changes in the estimates of prices and margins of the input; changes in the projections of prices, margins and demand for products sold; changes in equipment and input prices, wages and other correlated costs; as well as project planning deficiencies (engineering and supply).
>
> The outcome of the appraisals indicated that the assets with fair value below the book value would total R$ 88.6 billion of lower difference.  The assets with higher fair value totaled R$ 27.2 billion of higher difference than the book value.

120.    Elsewhere in the January 28, 2015 financial statements, Petrobras discussed a second means of calculating the improper capitalization of amounts attributable to corruption. This approach utilized both (1) an average of 3% of improper payments (mentioned in Costa's deposition to the Brazilian Federal Court) and (2) specific amounts of improper payments mentioned in depositions taken in the course of investigations of the scandal.  The resulting estimate of necessary writedowns was R$4.06 billion (approximately $1.26 billion).  The 3% figure was identified as merely "a **minimum** percentage of improper payments which increased the amounts charged to the Company."  Moreover, the January 28, 2015 financial statements noted that the depositions taken thus far did not provide sufficient detail to justify recording an

entry in the Company's books and records.  "Additional information regarding the investigations

that may arise in the future . . . could result in further adjustments to the financial statements,

expansion of the scope for new contracts and companies, or extension of the period of analysis."

As discussed below, the Company did not produce audited financial statements or decide on the

size of the necessary writedowns until April 22, 2015.  *See* § VII.F, *infra*.

### E.   PETROBRAS MANAGEMENT RESIGNS *EN MASSE*

121.   On February 4, 2015, Petrobras announced that CEO Foster, CFO Barbassa and

four other senior executives were resigning from the Company.  According to a February 4, 2015

REUTERS article, *Petrobras Changes To Take Time, Even With New CEO*:

> Foster appears to have been pressured by Rousseff and members of her ruling
> Workers' Party to leave Petrobras because she was too ready to acknowledge the
> company's problems.

> On Jan. 23, Foster and other top executives and board members agreed to write
> off more than 61.4 billion reais ($23 billion) of investments tainted by corruption
> and business decisions that didn't pan out, a source with direct knowledge of
> board actions told Reuters last week.

> Four days later, at Rousseff's request, board Chairman and former Finance
> Minister Guido Mantega vetoed the writedown because it threatened to give the
> impression that the government and Petrobras were corrupt, the source said,
> speaking on condition of anonymity.

> After that, it seemed it was only a matter of time before Foster would step down
> or be forced out. On Tuesday, Rousseff asked Foster to stay on to the end of the
> month until a replacement could be found, according to a government source, who
> also spoke on condition of anonymity.

> But Foster and her closest lieutenants decided not to wait.

122.   Also on February 4, 2015, Petrobras announced that:

> Fitch Ratings reviewed Petrobras' debt ratings from BBB to BBB-, and has placed
> these ratings on Rating Watch Negative.  This grade keeps Petrobras as an
> Investment Grade Company.   According to Fitch, this revision reflects the
> increased uncertainty regarding Petrobras' ability to record an adjustment to its
> fixed assets in a timely manner, increasing the risk that creditors could accelerate
> debt payments.   This review is also related to the potential impact of the

corruption investigations in production growth, since it may affect negotiations with suppliers and equipment availability, delaying delivery of production platforms.

**F.   PETROBRAS WRITES OFF $2.5 BILLION IN BRIBE AND CORRUPTION-RELATED PAYMENTS THAT WERE INAPPROPRIATELY CAPITALIZED**

123.   On April 22, 2015, Petrobras finally released its long-delayed audited financial results for the third quarter of 2014, the fourth quarter of 2014, and the full year of 2014, superseding the unaudited financials that the Company had published on January 28, 2015. Petrobras announced that it was writing off "US $2,527 million of capitalized costs representing amounts that Petrobras overpaid for the acquisition of [PP&E] in prior years." Petrobras stated the following regarding its methodology in calculating this write-off:

> Petrobras believes that the amounts it overpaid pursuant to this payment scheme should not have been included in historical costs of its [PP&E]. However, Petrobras cannot specifically identify either the individual contractual payments that include overcharges or the reporting periods in which overpayments occurred. As a result, Petrobras developed a methodology to estimate the aggregate amounts that it overpaid under the payment scheme, in order to determine the amount of the write-off representing the overstatement of its assets resulting from overpayments used to fund improper payments.
>
> *          *          *
>
> As it is impracticable to identify specific periods and amounts for the overpayments by the Company, the Company considered all the information available (as described above) to quantify the impact of the payment scheme and developed an estimation methodology to serve as a proxy for the adjustment that should be made to property plant and equipment using the five steps described below:
>
> - Identify contractual counterparties: the Company listed all the companies identified in public testimony, and using that information the Company identified all of the contractors and suppliers that were either so identified or were consortia including entities so identified.
>
> - Identify the period: the Company concluded from the testimony that the payment scheme was operating from 2004 through April 2012.
>
> - Identify contracts: the Company identified all contracts entered into with the counterparties identified in step 1 during the period identified in step 2,

41

which included supplemental contracts when the original contract was entered into between 2004 and April 2012.  It has identified all of the [PP&E] related to those contracts.

- Identify payments: the Company calculated the total contract values under the contracts identified in step 3.

- Apply a fixed percentage to the total contract values: the Company estimated the aggregate overpayment by applying a percentage indicated in the depositions (3%) to the total amounts for identified contracts.

For overpayments attributable to non-cartel members, unrelated to the payment scheme, the Company included in the write-off for incorrectly capitalized overpayments the specific amounts of improper payments or percentages of contract values, as described in the testimony, which were used by those suppliers and contractors to fund improper payments.

124.    The total impact of the adjustments is set forth in the table below:

| | Exploration & Production | Refining, Transportation & Marketing | Gas & Power | Distribution | International | Corporate | Total |
|---|---|---|---|---|---|---|---|
| Payment Scheme: Total Contract Amounts | $25.57 billion | $45.23 billion | $8.66 billion | $309 million | $307 million | $1.35 billion | $81.44 billion |
| Estimated Aggregate Overpayments (3%) | $767 million | $1.36 billion | $264 million | $9 million | $9 million | $41 million | $2.51 billion |
| Unrelated Payments (Outside the Cartel) | $57 million | — | $4 million | — | — | — | $61 million |
| Total Overpayments | $824 million | $1.36 billion | $264 million | $9 million | $9 million | $41 million | $2.51 billion |
| Reversal Of Depreciation Of The Affected Assets | ($35 million) | ($81 million) | ($21 million) | — | — | ($4 million) | ($141 million) |
| Impact On PP&E | $789 million | $1.28 billion | $243 million | $9 million | $9 million | $37 million | $2.36 billion |
| Write-Down Of Tax Credits Related To Affected Assets | $15 million | $121 million | $23 million | — | — | $4 million | $163 million |

| | Exploration & Production | Refining, Transportation & Marketing | Gas & Power | Distribution | International | Corporate | Total |
|---|---|---|---|---|---|---|---|
| Write-Off: Overpayments Incorrectly Capitalized | $804 million | $1.40 billion | $266 million | $9 million | $9 million | $41 million | $2.53 billion |

125.    In addition, the Company announced pre-tax impairment charges of $16.6 billion ($12.0 billion after taxes), including $11.6 billion in impairments relating to the Abreu e Lima and Comperj refineries linked to the fraud.  The Company stated that "[t]he impairment charges are mainly attributable to project planning deficiencies, to the use of a higher discount rate (which included a risk premium related to the stand-alone view of the assets), to the impact of a delay in expected cash inflows and lower projected economic growth."  The fact that such massive impairments were recorded on such highly visible, flagship assets further demonstrates the inadequacy of the Company's internal controls.

126.    Furthermore, there is reason to doubt that even these astronomical writedowns sufficiently capture the scope of the fraud.  The Petrobras Board voted 7-2 with one abstention to approve the 2014 financial statements.  All of the affirmative votes to approve the financial statements came from Board members selected by the government, while all three independent board members voted no or abstained.  The independent Board members complained that they were given less than two hours to review 319 pages of documents before voting to approve the financial statements and that they disagreed with the methodologies used.  In the Board minutes, Board member José Guimarães Monforte stated that several of his requests for documents were not responded to, and that "[a]s it was impossible to obtain information as detailed to allow a deeper analysis, it is impossible to conclude the diligence of reviewing the Financial Statement, making it impossible to adopt a position regarding such documents due to the lack of documents and information. . . . I also consider recording 3% referring to Operation Lavo Jato to be

inappropriate at the time and I hope that this is not the reference the company will use in the refund." Similarly, Board member Mauro Rodrigues da Cunha stated that his meetings with management "were not sufficient to convince me that the balance sheet of Petrobras reflects accurately the financial reality of the Company."

127.   Institutional Shareholder Services, Inc., a leading corporate governance firm, recommended that shareholders vote against the financial statements for the fiscal year ended December 31, 2014, because (i) significant concerns were raised regarding the methodology used to calculate corruption-related losses, (ii) the 2014 financial statements and statutory reports were approved only by the Board members appointed by the Brazilian government, four of whom were being investigated for potential breaches of their fiduciary duties, while minority Board representatives opposed or abstained from approving the financial statements, and (iii) approval of the Company's statutory reports might discharge Board members from civil liability for decisions made during the 2014 fiscal year.

## VIII.   PETROBRAS' VIOLATIONS OF ACCOUNTING STANDARDS

128.   Petrobras' improper capitalization of bribery and corruption-related payments violated GAAP and IFRS accounting standards in at least three ways.  *First*, by improperly capitalizing its bribery and corruption-related payments, and then failing to conduct appropriate writedowns, Petrobras overstated the value of its PP&E and the total value of its assets.  *Second*, because bribery and corruption-related payments should have been treated as operating expenses and deducted from net revenues rather than capitalized and depreciated over time, Petrobras' operating expenses were understated and its net income was overstated.

### A.   2009-2010 – US GAAP VIOLATIONS

129.   Petrobras' Form 20-F annual reports for 2009 and 2010 stated that "[t]he audited consolidated financial statements of Petrobras and our consolidated subsidiaries . . . have been

presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

130.    Accounting Standards Codification ("ASC") 360 of US GAAP requires that the carrying values of PP&E are initially measured at historical cost, including all normal expenditures necessary to bring the asset to a location and condition for its intended use.  GAAP does **not**, however, permit general administrative or overhead expenses to be included when capitalizing assets, since these costs do not give rise to any expectations of future profitability. As discussed in ¶¶113-120, however, during and prior to the Relevant Period the Company improperly capitalized bribery and corruption-related payments that inflated the costs of the properties it acquired without in any way enhancing the values of the properties.  By doing so, Petrobras violated US GAAP.

131.    US GAAP also requires that a company write down the values of its PP&E when events indicate that the carrying value of an asset or group of assets may not be recoverable. ASC 360-10-35-17 provides that, "An impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. . . .  An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value."

132.    Petrobras specifically represented that it was, in fact, conducting reviews of its long-lived assets in order to determine whether writedowns were necessary and appropriate as required by US GAAP.  The Company's Forms 20-F for 2009 and 2010 each stated that:

> *In accordance with Codification Topic 360-10, management reviews long-lived assets, primarily [PP&E] to be used in the business and capitalized costs relating to oil and gas producing activities, whenever events or changes in circumstances indicate that the carrying value of an asset or group of assets may not be recoverable on the bases of undiscounted future cash flows.* The reviews are carried out at the lowest level of assets to which the Company is able

to attribute identifiable future cash flows. ***The net book value of the underlying assets is adjusted to their fair value using a discounted future cash flows model, if the sum of the expected undiscounted future cash flows is less than the book value.***

The main assumptions of cash flows are: prices based on last strategic plan presented, production curves associated to existent projects comprising the Company's portfolio, operating market costs and investments needed for projects conclusion.

133.    Petrobras knew that the carrying values of PP&E that had been impacted by bribery were not recoverable because those values had been inflated by fraud.  Petrobras, however, failed to conduct appropriate writedowns to reflect this fact.  As discussed in ¶¶123-127, the Company has admitted that such writedowns were necessary in amounts in excess of $2.5 billion.

134.    Because DD&A is calculated by reference to PP&E, Petrobras' inflated valuations of its PP&E also caused its DD&A to be overstated.  Petrobras' Forms 20-F for 2009 and 2010 each stated that PP&E are depreciated on a straight line basis.  Thus, the DD&A of each property that was affected by the bribery scheme was overstated to the degree that the property's capitalized cost was inflated by bribery.  For example, if a particular refinery's cost was inflated by 5% as a result of bribery, then each year's DD&A for that refinery would have been overstated by 5% as well.

135.    Petrobras' practice of capitalizing bribery and corruption-related payments also caused its operating expenses to be understated, and its net income to be overstated.  US GAAP provides that general and administrative expenses should be recorded as expenses, not capitalized, and Petrobras' Forms 20-F for 2009 and 2010 each state that its operating expenses include "general and administrative expenses."  Thus, by capitalizing bribery and corruption-related payments rather than recording them as operating expenses, Petrobras understated its operating expenses.  Because operating expenses are ***subtracted*** from net operating revenues in

calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

      **B.**     **2011-2014 – IFRS VIOLATIONS**

136.    Beginning with fiscal year 2011, Petrobras switched from the use of US GAAP in its financial statements to IFRS.  Each of Petrobras' Form 20-F annual reports for 2011, 2012, and 2013 contained a statement to the effect that the Company's "consolidated financial statements have been prepared and are being presented in accordance with the International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board."   In addition, Petrobras' 2014 quarterly financial reports filed on Form 6-K were purportedly prepared under IFRS.

137.    Under IFRS, International Accounting Standard ("IAS") 16 governs the initial measurement of PP&E capitalization.  Certain relevant provisions of IAS 16 are listed below.

        a)     IAS 16-7 provides that "[t]he cost of an item of [PP&E] shall be recognized as an asset if, and only if: (a) it is probable that future economic benefits associated with the item will flow to the entity; and (b) the cost of the item can be measured reliably."

        b)     IAS 16-15 provides that "[a]n item of [PP&E] that qualifies for recognition as an asset shall be measured at its cost."

        c)     IAS 16-16 provides that "[t]he cost of an item of [PP&E] comprises: (a) its purchase price, including import duties and non-refundable purchase taxes, after deducting trade discounts and rebates[; and] (b) any costs directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management."

d)    IAS 16-19(d) provides that "[e]xamples of costs that are not costs of an item of [PP&E] are: administration and other general overhead costs."

138.    Petrobras stated in its Form 20-F filings that it was preparing its financial statements in accordance with IFRS and following these rules.  Its 2011, 2012 and 2013 Forms 20-F each included language to the effect that, [PP&E], net is stated at the cost of acquisition or construction, which represents the costs incurred for bringing the asset to the condition for operation, adjusted during hyperinflationary periods, less accumulated depreciation and impairment losses."  But to the extent that acquisition or construction costs were inflated by bribery and corruption-related payments, IFRS required that those added costs be expensed rather than capitalized.  IFRS Conceptual Framework 4.52 notes that, "[a]n expense is recognised immediately in the income statement when an expenditure produces no future economic benefits or when, and to the extent that, future economic benefits do not qualify, or cease to qualify, for recognition in the balance sheet as an asset."

139.    Because repaying bribes to contractors did not give rise to any future economic benefits that would flow to Petrobras, and because the costs of corruption, by their nature, cannot be measured reliably, the costs that Petrobras incurred by repaying bribes did not qualify for recognition as assets under IAS 16-7.  Rather, they would fall under the category of general overhead costs, which IAS 16-19(d) specifies may ***not*** be capitalized.

140.    Furthermore, like US GAAP, IFRS requires that capitalized items of PP&E be written down where there is evidence that the carrying value of those assets exceeds their fair value (i.e. market value as determined by an appraisal).  Relevant portions of IAS 16 include

a)     IAS 16-30: "After recognition as an asset, an item of [PP&E] shall be carried at its cost less any accumulated depreciation and any accumulated impairment losses."

b)     IAS 16-31: "After recognition as an asset, an item of [PP&E] whose fair value can be measured reliably shall be carried at a revalued amount, being its fair value at the date of the revaluation less any subsequent accumulated depreciation and subsequent accumulated impairment losses. Revaluations shall be made with sufficient regularity to ensure that the carrying amount does not differ materially from that which would be determined using fair value at the end of the reporting period."

c)     IAS 16-32: "The fair value of land and buildings is usually determined from market-based evidence by appraisal that is normally undertaken by professionally qualified valuers.  The fair value of items of plant and equipment is usually their market value determined by appraisal."

d)     IAS 16-34: "The frequency of revaluations depends upon the changes in fair values of the items of [PP&E] being revalued.  When the fair value of a revalued asset differs materially from its carrying amount, a further revaluation is required . . . ."

141.     Regarding revaluation, Petrobras' 2011, 2012 and 2013 Forms 20-F each included language substantially identical to the below:

> ***[PP&E] and intangible assets with definite useful lives are assessed for impairment when there is evidence that the carrying amount may not be recoverable.***
>
> Assets related to exploration and development of oil and gas and assets that have an indefinite useful life, such as goodwill, are tested for impairment annually. . . .

> ***Impairment test comprises a comparison of the carrying amount of a cash generating unit with its recoverable amount. Where the carrying amount of cash generating unit exceeds its recoverable amount, it is considered impaired and is written off to its recoverable amount.*** Reversal of previously recognized impairment losses is permitted, except for goodwill.
>
> The recoverable amount of an asset or group of assets is the higher amount between its fair value less cost to sell and its value in use. Value in use is generally used by the Company for impairment testing purposes, except when specifically indicated.

142.    Petrobras violated IAS 16 by failing to write down to their market value those assets whose costs had been inflated by fraud.  Petrobras knew that the fair value of its assets differed materially from their carrying values, and that to the extent its asset values had been inflated by bribery and corruption-related payments, that inflation was not recoverable. Nevertheless, the Company failed to take appropriate writedowns as required by IAS 16-30, 16-31, 16-32, and 16-34.

143.    Petrobras' inflated PP&E valuations also caused its DD&A to be overstated. Petrobras' 2011, 2012 and 2013 Forms 20-F each contained a statement to the effect that, "[e]xcept for land, which is not depreciated, other [PP&E] are depreciated on a straight line basis."  Petrobras' inflated valuations of its PP&E also caused its DD&A to be overstated. Again, the DD&A of each property that was affected by the bribery scheme was overstated to the degree that property's capitalized cost was inflated by bribery.  For example, if a particular refinery's cost was inflated by 5% as a result of bribery, then each year's DD&A for that refinery would have been overstated by 5% as well.

144.    Finally, Petrobras' practice of capitalizing bribery and corruption-related payments also caused its operating expenses to be understated, and its net income to be overstated.  As discussed above, IAS 16-7 prohibits the recognition of general and administrative expenses not likely to cause future economic benefits as capital assets.  Rather, these expenses

should be recorded as operating expenses under IAS 7 and included in the reporting entity's cash flow statement.  Petrobras' Forms 20-F for 2009 and 2010 each state that its operating expenses include "general and administrative expenses."  Thus, by capitalizing bribery and corruption-related payments rather than recording them as operating expenses, Petrobras understated its operating expenses.  Because operating expenses are *subtracted* from net operating revenues in calculating net income (but capitalized expenses are not), the understatement of operating expenses caused net income to be overstated by a corresponding amount.

## IX.   DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS

### A.   FALSE STATEMENTS AND OMISSIONS RELEVANT TO EXCHANGE ACT CLAIMS

#### 1.   May 20, 2010 – 2009 Form 20-F

145.   On May 20, 2010, Petrobras and PifCo filed the 2009 Form 20-F, which reported that as of December 31, 2009, the Company had net PP&E of $136 billion, total assets of $200 billion, total costs and expenses of $70 billion (including depreciation, depletion, and amortization ("DD&A") of $7.1 billion), and net income of $15.5 billion.  The 2009 Form 20-F also included the following certification signed by CEO Gabrielli that Petrobras' internal controls over financial reporting were effective:

I, José Sérgio Gabrielli de Azevedo, certify that:

1.   I have reviewed this annual report on Form 20-F of Petróleo Brasileiro S.A. – PETROBRAS (the "Company");

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4. The Company's other certifying officer [Defendant Barbassa] and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.     The Company's other certifying officer [Defendant Barbassa] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

146.     These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets;

(2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.  While the 2009 Form 20-F was filed more than five years prior to the institution of this action, it was later incorporated by reference in the Petrobras prospectus supplement offering the 2011 Notes.

> **2.    August 24-25, 2010 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2010**

147.    On August 24, 2010, Petrobras issued a press release announcing its results of operations for the second quarter of 2010.  The Company reported that as of June 30, 2010, it had net PP&E of $147 billion, total assets of $211 billion, total costs and expenses of $23.4 billion including DD&A of $2.1 billion, and net income of $4.2 billion.

148.    In a letter to shareholders and investors released together with the August 24, 2010 press release, CEO Gabrielli stated:

> We are passing through an exceptional time in our history. In the first six months of 2010, *we invested a record amount of U.S.$19,387 million, 35,8% more than the same period last year, primarily allocated to increasing oil and gas production capacity, modernizing and expanding our refineries and reorganizing our interests in the petrochemical sector*, particularly in regard to Braskem.

> This substantial increase in capital expenditures is a reflection of the number and quality of projects in our investment portfolio, as reflected in the expansion of our strategic business plan. In June, we released the 2010-2014 Business Plan, in which we project investment spending of U.S. $224 billion, or approximately U.S. $45 billion per year.

149.    On August 25, 2010, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the six-month period ended June 30, 2010, which set forth substantially similar figures as in the August 24, 2010 press release.

150.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.   In addition, CEO Gabrielli's statements in the shareholder letter were false and misleading due to his failure to mention bribery and corruption-related expenses as one of the factors responsible for the growth of the Company's capital expenditures.

### 3.    October 8, 2010 – Facts and Data Post Regarding Overpricing

151.    On October 8, 2010, Petrobras posted an entry on its Facts and Data blog regarding a media report discussing possible overpricing of Petrobras contracts.  Petrobras stated that:

> Petrobras reiterates that there are no irregularities in the Rio de Janeiro Petrochemical Complex (Comperj). . . . There is no overbilling.  Petrobras reiterates that there are technical discrepancies between the methodologies used by the company and those used by the TCU.  The criteria used by the [TCU] are insufficient and do not apply to projects like Comperj, which is much more complex and has many unique characteristics.  Petrobras cooperated with the TCU in its requests and there was no obstruction . . . .

> In preparing its tender processes, Petrobras strictly adheres to the terms from Decree No. 2,745/98, which pertains to the Simplified Tender Procedure, and which granted the Company certain flexibility to develop its projects in an efficient and economically viable manner.

152.    These statements were materially false and misleading, because the TCU found that contracts involved in the Comperj program suffered from irregularities including overpayment of contracts, lack of effective controls, and signing contracts in emergency

timeframes that did not allow competing contractors to bid, and that Petrobras management had acted recklessly.  ¶¶81, 91.

### 4.    November 9, 2010 – Facts and Data Post Regarding The Repar and Abreu e Lima Refineries

153.    On November 9, 2010, Petrobras posted an entry on its Facts and Data blog regarding the TCU's findings at the Repar and Abreu e Lima refineries, strongly denying allegations of overbilling and contractual irregularities.  Petrobras stated that:

> Petrobras denies that there are any irregularities in the works and projects of the Getúlio Vargas (Repar) and Abreu e Lima (Rnest) refineries.  The Company has already demonstrated to the [TCU] that there is no overpricing, though there is a discrepancy in parameters.  ***The criteria used by the TCU do not apply to projects such as an oil refinery***, such projects which are more complex and have unique characteristics.

> In preparing its tender documents, Petrobras has rigorously upheld the terms from Decree 2,745/98, which pertains to the Simplified Tender Procedure and grants the Company certain flexibility to develop its projects in an efficient and economically viable manner.

> Petrobras reiterates that the pricing acceptance criteria contested by the Court is in fact consistent with domestic and international technical standards on this matter.  In addition, when establishing prices, the Company also considers aspects relating to safety, the environment, human health, and social responsibility.   These requirements bring about significant results, including low incidence of accidents in these projects.

> Petrobras constantly cooperates with oversight bodies, and when there are discrepancies, it seeks to clarify them, and it has done so systematically in the case of these projects.

(Emphasis in original.)

154.    These statements were materially false and misleading because, contrary to the Company's denials, the costs of the Repar and Abreu e Lima refineries included irregularities in that they were significantly inflated by the bribery scheme.

### 5.   November 23 and 24, 2010 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2010

155.   On November 23, 2010, Petrobras issued a press release announcing its results of operations for the third quarter of 2010.  The Company reported that as of September 30, 2010, it had net PP&E of $206 billion, total assets of $298 billion, total costs and expenses of $25.1 billion including DD&A of $2.1 billion, and net income of $4.7 billion.

156.   On November 24, 2010, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the nine-month period ending September 30, 2010 with figures substantially similar to those set forth in the Company's November 23, 2010 press release.

157.   These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 6.   January 18, 2011 – Prospectus Supplement Offering The 2011 Notes

158.   On January 18, 2011, Petrobras filed a prospectus supplement on Form 424B2 in connection with the offer and sale of the 2011 Notes.  This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo 2009 Form 20-F, filed on May 20, 2010; and (2) the Petrobras Report on Form 6-K filed with the SEC on November 24, 2010, containing financial information for the nine-month period ending September 30, 2010.  As discussed in ¶¶145-146 and ¶¶155-159, both of these documents contained material misstatements and omissions.

### 7. March 15, 2011 – Press Release Announcing 2010 Financial Results

159.    On March 15, 2011, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2010.  The Company reported that as of December 31, 2010, it had net PP&E of $219 billion, total assets of $309 billion, total costs and expenses of $96 billion DD&A of $8.5 billion, and net income of $19.2 billion.

160.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 8. May 24 and 26, 2011 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2011

161.    On May 24, 2011, Petrobras issued a press release announcing its results of operations for the first quarter of 2011.  The Company reported that as of March 31, 2011, it had net PP&E of $230 billion, total assets of $331 billion, total costs and expenses of $25.2 billion including DD&A of $2.3 billion, and net income of $6.5 billion.

162.    On May 26, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2011, which set forth substantially similar figures as in the May 24, 2011 press release.

163.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and

corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 9.   May 26, 2011 – 2010 Form 20-F

164.   Also on May 26, 2011, Petrobras and PifCo filed the 2010 Form 20-F, which set forth substantially similar figures as in the March 15, 2011 press release.  The 2010 Form 20-F also included certifications substantially similar to those described in ¶145, certifying that Petrobras' internal controls over financial reporting were effective.

165.   These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 10.   June 6, 2011 – 2010 Sustainability Report

166.   On or about June 6, 2011, Petrobras published its 2010 Sustainability Report on its website.  This document stated that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that "[t]his company does not use child or slave labor, it is not involved in prostitution or sexual exploitation of children or adolescents, ***and it is not involved in corruption***."

167.   These statements were false and misleading because Petrobras was effectively contributing money to Brazilian political officials and was involved in a multi-billion dollar bribery scheme.

**11.     August 14 and 25, 2011 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2011**

168.    On August 14, 2011, Petrobras issued a press release announcing its results of operations for the second quarter of 2011.  The Company reported that as of June 30, 2011, it had net PP&E of $247 billion, total assets of $351 billion, total costs and expenses of $31.2 billion including DD&A of $2.5 billion, and net income of $6.6 billion.

169.    On August 25, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2011, which set forth substantially similar figures as in the August 14, 2011 press release.

170.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

**12.     November 22, 2011 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2011**

171.    On November 22, 2011, Petrobras issued a press release announcing its results of operations for the third quarter of 2011.  The Company reported that as of September 30, 2011, it had net PP&E of $220 billion, total assets of $309 billion, total costs and expenses of $31.5 billion including DD&A of $2.6 billion, and net income of $3.9 billion.

172.    Also on November 22, 2011, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2011, which set forth substantially similar figures as in the November 22, 2011 press release.

173.    These statements were materially false and misleading because (1) Petrobras'

claimed asset valuations were materially overstated due to the improper inclusion of bribery and

corruption-related payments to contractors and others in the recorded value of certain assets;

(2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and

corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and

misleading as a result of the bribery and corruption-related asset overstatements.

### 13.    February 3, 2012 – Prospectus Supplement Offering The 2012 Notes

174.    On February 3, 2012, PifCo filed a prospectus supplement on Form 424B2 in

connection with the offer and sale of the 2012 Notes.  This prospectus supplement incorporated

by reference (1) the combined Petrobras and PifCo 2010 Form 20-F, filed on May 26, 2011; and

(2) the Petrobras Report on Form 6-K filed with the SEC on November 22, 2011, containing

financial information for the nine-month period ending September 30, 2011.  As discussed in

¶¶164-165 and ¶¶171-172, both of these documents contained material misstatements and

omissions.

### 14.    February 28 and 29, 2012 – Press Release And Form 6-K Announcing 2011 Financial Results

175.    On February 28, 2012, Petrobras issued a press release announcing its results of

operations for the fourth quarter and full year of 2011.  The Company reported that as of

December 31, 2011, it had net PP&E of $182 billion, total assets of $319 billion, total costs and

expenses of $19 billion including DD&A of $10.5 billion, and net income of $20 billion.

176.    On February 29, 2012, Petrobras filed a Form 6-K with the SEC containing the

Company's financial statements for 2011, which set forth substantially similar figures as in the

February 28, 2012 press release.

177.    These statements were materially false and misleading because (1) Petrobras'
claimed asset valuations were materially overstated due to the improper inclusion of bribery and
corruption-related payments to contractors and others in the recorded value of certain assets;
(2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and
corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and
misleading as a result of the bribery and corruption-related asset overstatements.

### 15.    April 2, 2012 – 2011 Form 20-F

178.    On April 2, 2012, Petrobras and PifCo filed the 2011 Form 20-F, which set forth
substantially similar figures as in the February 28, 2012 press release.  The 2011 Form 20-F also
included certifications substantially similar to those described in ¶145, signed by Defendants
Petrobras CEO Foster and CFO Barbassa, as well as PifCo CEO Oliveira and CFO Tinoco,
certifying that Petrobras' internal controls over financial reporting were effective.

179.    These statements were materially false and misleading because (1) Petrobras'
claimed asset valuations were materially overstated due to the improper inclusion of bribery and
corruption-related payments to contractors and others in the recorded value of certain assets;
(2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and
corruption-related asset overstatements; (3) Petrobras' stated net income was also false and
misleading as a result of the bribery and corruption-related asset overstatements; and
(4) Petrobras' internal controls over financial reporting were not effective.

### 16.    May 15, 2012 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2012

180.    On May 15, 2012, Petrobras issued a press release announcing its results of
operations for the first quarter of 2012.  The Company reported that as of April 30, 2012, it had

net PP&E of $194 billion, total assets of $338 billion, total costs and expenses of $4.7 billion including DD&A of $2.7 billion, and net income of $5.3 billion.

181.    On May 17, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2012, which set forth substantially similar figures as in the May 15, 2012 press release.

182.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 17.    June 21, 2012 – 2011 Sustainability Report

183.    On or about June 21, 2012, Petrobras published its 2011 Sustainability Report on its website.  This document included the following statements about the anti-corruption policies of the "Petrobras System," i.e., Petrobras and its subsidiaries, affiliates, and associated companies (among others):

> ***The Petrobras System refuses any practice that involves corruption or bribery***, and uses management instruments such as the Competition Behavior and Good Practice codes, in addition to following the Code of Conduct of the High Federal Administration, the application of which is inspected by the Presidency of the Republic's Ethics Commission.
>
> *                *                *
>
> According to its Code of Ethics' guidelines, the Petrobras System makes no contributions to political parties or to candidates for elective offices.  The company's business requires transparency in actions and positions, particularly regarding the information published to society.
>
> *                *                *

To ensure transparency in its relations with the Government, ***Petrobras System's Code of Ethics determines the company will not make contributions to political parties or to campaigns of candidates to elected office.  It also emphasizes that it refuses any act of corruption and bribery*** and that it has formal control and consequence procedures in place to handle any breaches occurring within the company.

*      *      *

The company does not use child or slave labor, it is not involved in prostitution or sexual exploitation of children or adolescents, or ***corruption.***

184.    These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and was involved in a multi-billion dollar bribery scheme.

### 18.    August 3, 2012 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2012

185.    On August 3, 2012, Petrobras issued a press release announcing its results of operations for the second quarter of 2012.  The Company reported that as of June 30, 2012, it had net PP&E of $185 billion, total assets of $311 billion, total costs and expenses of $10.2 billion including DD&A of $5.3 billion, and net income of $4.3 billion.

186.    On August 10, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2012, which set forth substantially similar figures as in the August 3, 2012 press release.

187.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 19.    August 29, 2012 – 2012 Registration Statement

188.    On August 29, 2012, Petrobras, PifCo and PGF filed the 2012 Registration Statement.  The 2012 Registration Statement incorporated by reference a number of documents, including (1) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011; and (2) the August 10, 2012 Form 6-K containing financial information for the six-month period ended June 30, 2012.  These documents contained material misstatements and omissions.

189.    The 2011 Form 20-F stated that the value of the Company's "[PP&E], net" as of December 31, 2011 was $182 billion, and that its total assets were $319 billion.  The 2011 Form 20-F also stated that Petrobras' DD&A expenses for 2011 were $10.5 billion, and that its net income was $20 billion.  It also reported that the Company's internal controls over financial reporting were effective.

190.    The August 10, 2012 Form 6-K stated that the value of the Company's "[PP&E], net" as of June 30, 2012 was $185 billion, and that its total assets were $311 billion.  The August 10, 2012 Form 6-K also stated that Petrobras' DD&A expenses for the six-month period ending June 30, 2012 were $5.3 billion, and that its net income for that period was $4.3 billion.

191.    The above-listed descriptions of Petrobras' asset values, expenses, net income, and the assertions that the Company did not suffer from material weaknesses in internal controls were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the

bribery and corruption-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 20.    October 26, 2012 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2012

192.    On October 26, 2012, Petrobras issued a press release announcing its results of operations for the third quarter of 2012.  The Company reported that as of September 30, 2012, it had net PP&E of $191 billion, total assets of $318 billion, total costs and expenses of $5.7 billion including DD&A of $2.6 billion, and net income of $2.8 billion.

193.    On October 30, 2012, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2012, which set forth substantially similar figures as in the October 26, 2012 press release.

194.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 21.    December 29, 2012 – Facts and Data Post Regarding Internal Controls

195.    On December 29, 2012, Petrobras posted an entry on its Facts and Data Blog regarding the Company's internal controls and transparency.  The Company stated that:

> [A]ll Petrobras activities and its employees are strictly guided by the principles of transparency and ethicality.  The Petrobras System rejects any act of corruption and employs rigorous management tools to guarantee protection of the interests of the Company's shareholders. . . .
>
> All Petrobras activities are monitored by the Board of Directors, which is comprised of representatives from the Government and private shareholders.

Petrobras accounts are constantly and continuously reviewed by internal and external audits, through the Office of the Federal Comptroller General (CGU) and the [TCU].  The Company is compliant with the requirements of authorities such as the Securities Commission (CVM) and the United States Securities and Exchange Commission (SEC), and those contained in the Sarbanes-Oxley Act, and the Company's balance sheets are audited and approved in all instances.

196.    These statements were materially false and misleading due to the Company's failure to admit to a pervasive and enormous bribery scheme while touting its internal controls, audits and supposed transparency.

### 22.    January 7, 2013 – Facts and Data Posts Regarding The Comperj Refinery

197.    On January 7, 2013, Petrobras posted an entry on its Facts and Data blog regarding the Comperj refinery, strongly denying allegations of overbilling and contractual irregularities.  Petrobras stated that:

The Company further reiterates that there are no irregularities in the projects and works of the Rio de Janeiro Petrochemical Complex.  Petrobras has clarified all questions submitted by the [TCU], and reiterates that, as of yet, there has been no final judgment finding any irregularities.

198.    These statements were materially false and misleading because, contrary to the Company's denials, the costs of the Comperj refinery had been significantly inflated by the bribery and corruption scheme.

### 23.    February 4, 2013 – Press Release And Form 6-K Announcing 2012 Financial Results

199.    On February 4, 2013, Petrobras issued a press release announcing its results of operations for the fourth quarter and full year of 2012, and on February 6, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for 2012.  The Company reported that as of December 31, 2012, it had net PP&E of $205 billion, total assets of $332 billion, total costs and expenses of $19.6 billion including DD&A of $11.1 billion, and net income of $10.9 billion.

200. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 24.  April 26, 2013 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2013

201. On April 26, 2013, Petrobras issued a press release announcing its results of operations for the first quarter of 2013.  The Company reported that as of March 31, 2013, it had net PP&E of $214 billion, total assets of $345 billion, total costs and expenses of $9 billion including DD&A of $3.2 billion, and net income of $3.9 billion.

202. On April 30, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2013, which set forth substantially similar figures as in the April 26, 2013 press release.

203. These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 25.  April 29, 2013 – 2012 Form 20-F

204. On April 29, 2013, Petrobras and PifCo filed the 2012 Form 20-F, which set forth substantially similar figures as in the February 4, 2013 press release.  The 2012 Form 20-F also

included certifications substantially similar to those described in ¶145, signed by CEO Foster and CFO Barbassa, certifying that Petrobras' internal controls over financial reporting were effective.

205.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 26.    May 15, 2013 – Prospectus Supplement For The 2013 Notes

206.    On May 13, 2013, Petrobras issued a press release announcing the pricing of the 2013 Notes, comprising $11 billion in six series of notes to be issued by PGF.  On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2013 Notes. This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo 2012 Form 20-F; and (2) the Petrobras Report on Form 6-K filed with the SEC on August 10, 2012, containing financial information for the six-month periods ended June 30, 2012 and 2011. Both of these documents contained material misstatements and omissions.

207.    The Petrobras 20-F for 2012 stated that the value of the Company's "[PP&E], net" as of December 31, 2012 was $205 billion, and that its total assets were $332 billion.  The 2012 Form 20-F also stated that Petrobras' DD&A expenses for 2012 were $11.1 billion, and that its net income was $11 billion.  It also reported that the Company's internal controls over financial reporting were effective.

208.    The August 10, 2012 Form 6-K stated that the value of the Company's [PP&E], net" as of June 30, 2012 was $185 billion, and that its total assets were $311 billion.  The August 10, 2012 Form 6-K also stated that Petrobras' DD&A expenses for the six-month period ending June 30, 2012 were $5.3 billion, and that its net income for that period was $4.3 billion.

209.    The above-listed descriptions of Petrobras' asset values, expenses, and net income, and the assertions that the Company did not suffer from material weaknesses in internal controls, were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 27.    May 2013 – 2012 Sustainability Report

210.    In or around May 2013, Petrobras published its 2012 Sustainability Report on its website.  This document included the following statements regarding the Company's anti-corruption policies:

> To ensure transparency in our relations with the Government, our Code of Ethics states that *we do not contribute to political parties or political campaigns of candidates to elective office.  We emphasize our refusal to countenance corrupt practices or bribery*, and we maintain formal control procedures with consequences in the event of any transgressions in the company.
>
> *        *        *
>
> No cases of corruption were detected in 2012.  *We reject all corrupt practices and payment of bribes*, and we use the Competitive Conduct and Good Practice Codes, and follow the Federal Administration Code of Conduct, which has its application overseen by the Public Ethics Commission of the Presidency.

\*       \*       \*

The company does not use child or slave labor, nor is it involved in prostitution or sexual exploitation of children or adolescents, ***or corruption.***

211.    These statements were false and misleading because Petrobras was contributing money to Workers' Party officials and was involved in a multi-billion dollar bribery and corruption scheme.

### 28.    August 7, 2013 – Facts and Data Posting Regarding The Acquisition of the Pasadena Refinery

212.    On August 7, 2013, Petrobras posted an entry on its Facts and Data blog recounting Gabrielli's testimony at a Brazilian congressional hearing regarding the acquisition of the Pasadena Refinery.  This posting stated in part that:

> Last Tuesday (Aug 6), our former CEO, José Sergio Gabrielli, participated in the hearing of the Environment, Consumer Protection, and Oversight and Surveillance Committee (CMA) called by Senator Ivo Cassol (PP-RO). Gabrielli went to Brasilia to speak about the 2006 purchase of the Pasadena Refinery, in the US state of Texas.
>
> ***According to the former CEO, the purchase was a normal transaction based on market conditions. He attributed allegations in the press regarding overbilling and irregularities in the transaction to a lack of understanding of the oil and petroleum-based products market***, and he denied the claim that payment was above market rates, as was reported in the magazine *Veja*.

(Emphasis in original.)

213.    These statements were false and misleading because the acquisition of the Pasadena Refinery was not a "regular operation, based on market conditions," but rather was linked to the bribery and corruption scheme, with Costa admitting that he accepted $1.5 million in connection with the purchase.  ¶74.

70

### 29.   August 9, 2013 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2013

214.   On August 9, 2013, Petrobras issued a press release announcing its results of operations for the second quarter of 2013.  The Company reported that as of June 30, 2013, it had net PP&E of $204 billion, total assets of $338 billion, total costs and expenses of $16.6 billion including DD&A of $3.4 billion, and net income of $2.7 billion.

215.   On August 13, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2013, which set forth substantially similar figures as in the August 9, 2013 press release.

216.   These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

### 30.   October 25, 2013 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2013

217.   On October 25, 2013, Petrobras issued a press release announcing its results of operations for the third quarter of 2013.  The Company reported that as of September 30, 2013, it had net PP&E of $208 billion, total assets of $340 billion, total costs and expenses of $27.6 billion including DD&A of $3.3 billion, and net income of $1.5 billion.

218.   On October 28, 2013, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the third quarter of 2013, which set forth substantially similar figures as in the October 25, 2013 press release.

219.    These statements were materially false and misleading because: (1) Petrobras'

claimed asset valuations were materially overstated due to the improper inclusion of bribery and

corruption-related payments to contractors and others in the recorded value of certain assets;

(2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and

corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and

misleading as a result of the bribery and corruption-related asset overstatements.

### 31.    February 25, 2014 – Press Release And Form 6-K Announcing 2013 Financial Results

220.    On February 25, 2014, Petrobras issued a press release announcing its results of

operations for the fourth quarter and full year of 2013.  The Company reported that as of

December 31, 2013, it had net PP&E of $228 billion, total assets of $321 billion, total costs and

expenses of $16.9 billion including DD&A of $13.2 billion, and net income of $10.8 billion.

221.    The press release also quoted CEO Foster as stating:

Additionally, I would like to notice that **in the second half of 2013 we
implemented the Corruption Prevention Program**, reaffirming the commitment
of the Petrobras Executive Board and of its employees with ethics and
transparency at our organization. The program complies with both national and
international initiatives against fraud and corruption, as well as with the laws of
the countries where Petrobras operates, with positive impacts in the relations with
all its stakeholders.

222.    On February 26, 2014, Petrobras filed a Form 6-K with the SEC containing the

Company's financial statements for 2013, which set forth substantially similar figures as in the

February 25, 2014 press release.

223.    On March 7, 2014, Petrobras issued a press release regarding its internal controls

over financial reporting, stating:

Our management has assessed the effectiveness of our internal control over
financial reporting as of December 31, 2013, based on the criteria established in
Internal Control-Integrated Framework (1992) issued by the Committee of
Sponsoring Organizations of the Treadway Commission (COSO). **Based on such**

*assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013*.

224.    On March 10, 2014, Petrobras filed a Form 6-K/A with the SEC setting forth substantially the same content as the March 7, 2014 press release, accompanied by the report of KPMG Auditores Independentes.

225.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements; and (4) it was misleading for CEO Foster to tout the Company's Corruption Prevention Program while failing to disclose the Company's deep involvement in bribery and corruption; and (5) the Company's internal controls were not effective.

### 32.    March 11, 2014 – Prospectus Supplement For 2014 Notes

226.    On March 10, 2014, Petrobras issued a press release announcing the pricing of the 2014 Notes, comprising $8.5 billion in six series of notes to be issued by PGF.  On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2014 Notes.  This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo 2012 Form 20-F; and (2) the Petrobras Report on Form 6-K filed with the SEC on February 26, 2014, containing financial statements for the year ending December 31, 2013.  Both of these documents contained material misstatements and omissions.

227.    The Petrobras 20-F for 2012 stated that the value of the Company's "[PP&E], net" as of December 31, 2012 was $205 billion, and that its total assets were $332 billion.  The

2012 Form 20-F also stated that Petrobras' depreciation, depletion and amortization expenses for 2012 were $11.1 billion, and that its net income was $11 billion. It also reported that the Company's internal controls over financial reporting were effective.

228.    The February 26, 2014 6-K reported that as of December 31, 2013, Petrobras had net PP&E of $228 billion, total assets of $321 billion, total costs and expenses of $16.9 billion including DD&A of $13.2 billion, and net income of $10.8 billion.

229.    The above-listed descriptions of Petrobras' asset values, expenses, net income, and the assertions that the Company did not suffer from material weaknesses in internal controls were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 33.    April 30, 2014 – 2013 Form 20-F

230.    On April 30, 2014, Petrobras filed the 2013 Form 20-F, which set forth substantially similar figures as in the February 25, 2014 press release. The 2013 Form 20-F also included certifications substantially similar to those described in ¶145, signed by CEO Foster and CFO Barbassa, certifying that Petrobras' internal controls over financial reporting were effective.

231.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets;

(2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements; and (4) Petrobras' internal controls over financial reporting were not effective.

### 34.    May 2014 – 2013 Sustainability Report

232.    In or around May 2014, Petrobras published its 2013 Sustainability Report on its website.   This document included the following statements regarding the Company's anti-corruption policies:

> In the second half of 2013, we introduced our Corruption Prevention Program, which reaffirms Petrobras management and workforce commitment to ethics and transparency in our organization.   The program meshes with local and international initiatives to combat fraud and corruption, and the legislation in countries in which we operate, thus favorably impacting relations with all stakeholders.

> In July, Petrobras introduced its Corruption Prevention Program in order to prevent, detect and correct fraud and corruption.   The program and its implementation are based on three aspects: prevention through education and clear policies on the importance of ethics in all our actions; mechanisms capable of detecting fraud or corruption; and a system of consequences to correct past problems.

> The program's benefits include reduced exposure to legal, image and reputational risk, strengthened corporate governance, centralized efforts for the shared aim of combating fraud and corruption, and improved relationships with stakeholders, such as partners and sources of funding.

> For our Internal Audit structure, the Executive Board approved a new General Controller Officer to strengthen implementation of control and compliance, including mitigation of fraud and corruption risk, in order to meet legal and regulatory requirements.   This decision was ratified by the Board of Directors in November.   The responsibilities of this General Office include the Corruption Prevention Program.

> All our suppliers and business partners are covered by our guidance on anti-corruption policies and procedures through our Code of Ethics stipulated in contractual instruments and posted on our website.   ***The Code requires the process of selecting and signing suppliers to be based strictly on legal and technical criteria for quality, cost and punctuality.***   Suppliers must have ethical

profiles in terms of their management practices and social and environmental responsibility. They must reject unfair competition practices or others contrary to the code's precepts, including our suppliers' supply chains.

Our standard contracts and services agreements now include an anti-corruption paragraph with procedures to be adopted in cases of illicit actions under Brazilian law, the 1977 Foreign Corrupt Practices Law (USA), or the Bribery Act 2010 (United Kingdom).

*      *      *

***Our Code of Ethics includes a commitment to refuse to support or contribute to political parties or campaigns of candidates running for elected office.***

233.    These statements were false and misleading because Petrobras was contributing money to Workers' Party officials, was involved in a multi-billion dollar bribery and corruption scheme, the Petrobras process for selecting and signing suppliers was not based strictly on criteria regarding quality, cost and punctuality, and the Company failed to disclose the effect that the bribery and corruption scheme had upon its accounting.

### 35.    May 9, 2014 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2014

234.    On May 9, 2014, Petrobras issued a press release announcing its results of operations for the first quarter of 2014. The Company reported that as of March 31, 2014, it had net PP&E of $241 billion, total assets of $354 billion, total expenses of $8.2 billion including DD&A of $3.0 billion, and net income of $2.4 billion.

235.    The press release also quoted CEO Foster as stating:

I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with ethics and transparency at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program. All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose.

236.    On May 12, 2014, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the first quarter of 2014, which set forth substantially similar figures as in the May 9, 2014 press release.

237.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements; and (4) it was misleading for Foster to tout the Company's Corruption Prevention Program while failing to disclose the multi-billion dollar bribery and corruption scheme that the Company had been operating.

### 36.    May 10, 2014 – Facts and Data Post Regarding SBM Offshore

238.    On May 10, 2014, Petrobras posted an entry on its Facts and Data blog regarding allegations concerning bribes made to Company employees by the Dutch oil rig contractor SBM Offshore.  Petrobras stated that:

> Petrobras vehemently denies the story published on Friday[,] May 9, 2014, in the newspaper *O Estado de São Paulo*, reiterating that it became aware of reports of alleged bribes to employees of the company, involving the firm SBM Offshore, on the date the story was published in the newspaper *Valor Econômico* on February 13, 2014.

> On that same day, the company established an Internal Verification Committee, which concluded, based on the works performed and within the scope of its regulatory authority, that there were no facts or documents that showed evidence of payment of kickbacks to employees of Petrobras.

239.    These statements were materially false and misleading because SBM did participate in the bribery and corruption scheme and provide bribes to Petrobras employees, and has since been barred from contracting with Petrobras.  ¶¶78-79, 281.

37.    **May 19, 2014 – Facts and Data Post Regarding The Abreu e Lima Refinery**

240.    On May 19, 2014, Petrobras posted an entry on its Facts and Data blog regarding the Abreu e Lima refineries, strongly denying allegations of overbilling and contractual irregularities.  Petrobras stated that:

> Petrobras reiterates that there is no "overbilling of R$69.6 million" in the contract with the Abreu e Lima consortium.  Since 2008, the company has been clarifying to the TCU that there are methodological differences for the accounting of items that are specific to the oil industry.  In fact, the Court revised the amounts, after those clarifications were made, to R$19 million.   The company continues in discussions with the TCU to demonstrate that there is no overpricing or overbilling in these projects.

241.    These statements were materially false and misleading because, contrary to the Company's denials, the costs of the Abreu e Lima refinery had been significantly inflated by the bribery and corruption scheme.

38.    **May 23, 2014 – Facts and Data Post Regarding Petrobras Payment Procedures And The Pasadena Refinery Acquisition**

242.    On May 23, 2014, Petrobras posted an entry on its Facts and Data blog regarding its internal procedures for payments and auditing, and the acquisition of the Pasadena Refinery. Petrobras stated that:

> Payments made for any reason and in any country follow strict and clear internal procedures and the pertinent legislation. In addition, we have an Internal Auditing area, which enjoys unrestricted access to any unit from the Petrobras System to verify procedural compliance in all operations.

> In addition to our internal processes, our accounts and balance sheets are subject to external audits, and because we are a publicly traded company, we are also subject to market regulatory entities (the Securities Commission in Brazil and the Securities and Exchange Commission of the United States) and all rules on

corporate governance and disclosure of information applicable to the market. Our contracts are monitored by oversight bodies, such as the [TCU] and the Office of the Federal Comptroller General (CGU).

Regarding the Pasadena Refinery, the final purchase prices are a result not only of negotiations between the parties but also of arbitration and judicial proceedings. Here we clarify, once again, the costs and prices:

We estimate that Astra paid to Crown, the previous owner of the refinery, at least US$360 million: US$248 million for the refinery and inventory, and US$112 million in investments.

In 2006, we paid US$189 million for 50% of the refinery and US$170 million for 50% of the trading company (oil and petroleum product trading company), in addition to US$70 million for inventory and payables/receivables adjustments.

The amounts paid in 2006 correspond to US$7,200 per barrel per day (bpd), while the average refinery purchase in the US market at that time was US$9,400 per barrel per day.

Beginning in 2007, disputes began between shareholders. In 2008, we began arbitration proceedings, and Astra exercised its option to sell its 50% equity stake. In 2009, the arbitration award was issued, but Astra challenges the award and sought other legal actions.

In 2012, the parties reached settlement, and amounts were paid as follows: US$295 million for the other 50% of the refinery, US$171 million for 50% of the shares in the trading company, and an addition US$ 354 million for interest, loans, and guarantees, as well as legal fees and supplemental items from the settlement with Astra.

As such, the total amount paid for the business of the Pasadena Refinery was US$1.249 billion.

We have cooperated and will continue to cooperate with investigation, monitoring, and oversight authorities, providing any additional information that may be necessary.

243.    These statements were materially false and misleading because (1) Petrobras did not have effective internal controls and procedures for preventing bribery and corruption-related payments and did not comply with applicable laws and (2) in listing the total amounts paid for the Pasadena Refinery, Petrobras did not break out bribery and corruption-related payments. ¶¶68-144.

### 39.    July 12, 2014 – Facts and Data Posting Regarding The Pasadena Refinery And SBM Offshore

244.    On July 12, 2014, Petrobras posted an entry on its Facts and Data blog reprinting a letter that it sent to the LOS ANGELES TIMES regarding the Pasadena Refinery and SBM Offshore.  Petrobras stated that:

> Regarding the purchase of the Pasadena refinery, despite what the story reports, Petrobras did not pay an "in extreme excess."  The purchase price was consistent with other refinery purchase/sale transactions in 2006. . . .

> Regarding SBM, Petrobras reiterates, as was already reported to the newspaper, that the Internal Verification Committee established by the company, based on the works performed and within the scope of its regulatory authority, did not find any facts or documents that prove payment of kickbacks to Petrobras employees.  It must also be stressed that the investigations conducted by SBM Offshore found no evidence of improper payments.

245.    These statements were materially false and misleading because (1) the price paid for the Pasadena Refinery was excessive insofar as it was inflated by bribery and corruption-related payments; and (2) SBM did participate in the bribery and corruption scheme and provide bribes to Petrobras employees, and has since been barred from contracting with Petrobras.  ¶¶74, 78-79, 281.

### 40.    August 8, 2014 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2014

246.    On August 8, 2014, Petrobras issued a press release announcing its results of operations for the second quarter of 2014.  The Company reported that as of June 30, 2014, it had net PP&E of $254 billion, total assets of $363 billion, total costs and expenses of $22 billion including DD&A of $3.5 billion, and net income of $2.3 billion.

247.    On August 11, 2014, Petrobras filed a Form 6-K with the SEC containing the Company's financial statements for the second quarter of 2014, which set forth substantially similar figures as in the August 8, 2014 press release.

248.    These statements were materially false and misleading because (1) Petrobras' claimed asset valuations were materially overstated due to the improper inclusion of bribery and corruption-related payments to contractors and others in the recorded value of certain assets; (2) Petrobras' stated DD&A expenses were also overstated as a result of the bribery and corruption-related asset overstatements; and (3) Petrobras' stated net income was also false and misleading as a result of the bribery and corruption-related asset overstatements.

**B.    FALSE STATEMENTS RELEVANT TO SECURITIES ACT CLAIMS**

**1.    False Statements And Omissions In The Offering Documents For The 2013 Notes**

**(a)    August 29, 2012 – 2012 Registration Statement**

249.    On August 29, 2012, Petrobras, PifCo and PGF filed the 2012 Registration Statement.  The 2012 Registration Statement incorporated by reference a number of documents, including (1) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011; and (2) the August 10, 2012 Form 6-K containing financial information for the six-month period ended June 30, 2012.  These documents contained material misstatements and omissions.

a)    The Petrobras 2011 Form 20-F contained the false statements and omissions discussed in ¶¶178-179, 188-189 *supra*; and

b)    The August 10, 2012 Form 6-K contained the false statements and omissions discussed in ¶¶186-187, 188-190, 208-209, *supra*.

**(b)    May 15, 2013 – Prospectus Supplement For 2013 Notes**

250.    On May 13, 2013, Petrobras issued a press release announcing the pricing of the 2013 Notes, comprising $11 billion in six series of notes to be issued by PGF.  On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2013 Notes.

This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo 2012 Form 20-F; and (2) the Petrobras Report on Form 6-K filed with the SEC on April 30, 2013, containing financial information for the three-month period ending March 31, 2013.  These documents contained material misstatements and omissions.

    a)    The Petrobras 2012 Form 20-F contained the false statements and omissions discussed in ¶¶204-205, 207, 209, 227-229, *supra*; and

    b)    The April 30, 2013 Form 6-K contained the false statements and omissions discussed in ¶¶201-203, *supra*.

### 2.    False Statements And Omissions In The Offering Documents For The 2014 Notes

#### (a)    August 29, 2012 – 2012 Registration Statement

251.   On August 29, 2012, Petrobras, PifCo and PGF filed the 2012 Registration Statement.  The 2012 Registration Statement incorporated by reference a number of documents, including (1) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011; and (2) the August 10, 2012 Form 6-K containing financial information for the six-month period ended June 30, 2012.  These documents contained material misstatements and omissions.

    a)    The Petrobras 2011 Form 20-F contained the false statements and omissions discussed in ¶¶178-179, 189, 191, *supra*; and

    b)    The August 10, 2012 Form 6-K contained the false statements and omissions discussed in ¶¶185-187, 190-191, 208-209, *supra*.

#### (b)    March 11, 2014 – Prospectus Supplement For 2014 Notes

252.   On March 10, 2014, Petrobras issued a press release announcing the pricing of the 2014 Notes, comprising $8.5 billion in six series of notes to be issued by PGF.  On March 11,

2014, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2014 Notes.  This prospectus supplement incorporated by reference (1) the combined Petrobras and PifCo 2012 Form 20-F; and (2) the Petrobras Report on Form 6-K filed with the SEC on February 26, 2014, containing financial statements for the year ending December 31, 2013.  Both of these documents contained material misstatements and omissions.

     a)      The Petrobras 20-F for 2012 contained the false statements and omissions discussed in ¶¶204-205, 207, 209, 227-229, *supra*; and

     b)      The February 26, 2014 Form 6-K contained the false statements and omissions discussed in ¶¶220, 222, 225, 228-29, *supra*.

## X.   THE TRUTH EMERGES, LEADING TO LARGE DECLINES IN THE PRICES OF PETROBRAS SECURITIES

253.   While the full degree to which bribery and accounting fraud have distorted Petrobras' balance sheet has likely not yet been revealed, a series of partial corrective disclosures between April 15, 2014 and March 19, 2015, caused the prices of Petrobras Notes to materially decline, leading to significant losses for investors such as Plaintiffs.

254.   By April 15, 2014, the Brazilian Congress had instituted an inquiry in response to apparent overspending by Petrobras on the Pasadena Refinery as well and allegations that Petrobras managers received bribes in connection with contracts Petrobras granted to SBM Offshore, a Dutch oil-production ship leasing company.  On that day, then-CEO Foster spoke about the project before a Brazilian Senate hearing, and conceded that the company was likely to lose money on the deal.  That same day, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2012 Notes | 71645WAU5 | $0.2580 | 0.2521% | $102.0720 |

255.     On May 7, 2014, it was reported that Petrobras' suppliers had made campaign donations to at least 121 Brazilian deputies and senators, furthering suspicions that the Company was involved in political misconduct.  Following this news, on May 8, 2014, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.0380 | 0.0368% | $103.3000 |
| 2013 Notes | 71647NAD1 | $0.6920 | 0.6924% | $99.2500 |

256.     On August 12, 2014, Bloomberg News reported that "[a] $4.4 billion money-laundering probe linked to state-run Petroleo Brasileiro SA is spreading to financial institutions as prosecutors investigate whether they met compliance requirements," and that units of banks including Citigroup, HSBC, and Bradesco were linked to the probe.  Following this news, on August 12, 2014, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.2390 | 0.2315% | $103.0040 |
| 2013 Notes | 71647NAD1 | $1.1800 | 1.1662% | $100.0000 |

257.     On Sunday, September 7, 2014, Bloomberg News reported that information was being leaked "to local media from a police investigation into alleged kickbacks involving [Petrobras] in an attempt to alter the results of the October national election," citing the Brazilian magazine Veja's reporting that politicians, including members and allies of the Workers' Party, had accepted bribes linked to Petrobras contracts.

258.     As a result of this news, on September 8, 2014, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2013 Notes | 71647NAD1 | $0.2500 | 0.2488% | $100.2500 |
| 2014 Notes | 71647NAJ8 | $0.3000 | 0.2947% | $101.5000 |

259.     On September 8, 2014, after the market closed, Petrobras issued a statement acknowledging Costa's arrest and the federal criminal investigation.  The Company stated, in part:

> It is in the best interests of the company's management to see the completion of all ongoing investigations. Any irregular acts that may have been committed by a person or group of people, whether or not they are company-employees, do not represent the conduct of the Petrobras institution and its workforce.

260.     Upon this statement by the Company, acknowledging "irregular acts" and "ongoing investigations," on September 9, 2014, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.6700 | 0.6478% | $102.7600 |
| 2012 Notes | 71645WAU5 | $0.4280 | 0.4152% | $102.6580 |

261.     On September 30, 2014, after the market closed, BLOOMBERG NEWS published an article stating that Duque "stamped and signed at least 6.6 billion Brazilian reals ($2.7 billion) in contracts for the Abreu e Lima refinery" and that in late 2009 Duque had recommended that Petrobras' executive board approve the over-billed contracts.  The article also reported that Costa had revealed to prosecutors that "misappropriation of funds also existed in other divisions including the one Duque headed."

262.     On October 1, 2014, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2012 Notes | 71645WAU5 | $0.0870 | 0.0854% | $101.7800 |
| 2013 Notes | 71647NAD1 | $0.0350 | 0.0349% | $100.1250 |
| 2013 Notes | 71647NAE9 | $0.2500 | 0.2494% | $100.0000 |

263.    On October 9, 2014, after the market closed, the Brazilian federal court released Costa's testimony.  Costa testified that kickbacks were paid to members of the Workers' Party.  According to an article by THE WALL STREET JOURNAL, Costa "alleged that a certain percentage of contracts at the refining unit at Petrobras were to go to members of the Workers' Party."

264.    On October 10, 2014, the release of Costa's testimony by the Brazilian federal court, as independently reported by THESTREET.COM, caused the prices of certain of Petrobras' Notes to fall, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2011 Notes | 71645WAT8 | $0.1940 | 0.1892% | $102.3500 |
| 2013 Notes | 71647NAD1 | $0.3000 | 0.2987% | $100.1500 |
| 2013 Notes | 71647NAE9 | $0.2900 | 0.2884% | $100.2600 |

265.    On October 16, 2014, before the market opened, BLOOMBERG reported that the TCU published a report concluding that Petrobras will pay $21.6 billion to complete the Comperj complex, a 60% overrun of the initial budget.  The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj."  The TCU concluded that Petrobras management had been "'reckless' with irregularities in the omission of technical analysis, overpaying for contracts and a lack of effective controls."  One member of the TCU commented that the regulator was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way."  The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."

266.    On October 16, 2014, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2011 Notes | 71645WAT8 | $0.4410 | 0.4293% | $102.2870 |
| 2013 Notes | 71647NAD1 | $0.2500 | 0.2500% | $99.7500 |
| 2013 Notes | 71647NAE9 | $0.5000 | 0.4950% | $100.5000 |

267.    On Saturday, October 18, 2014, Brazilian President Dilma Rousseff admitted that there had been embezzlement of public money at Petrobras and that the Brazilian government would seek reimbursement of funds illegally diverted from the Company.

268.    As a result of President Rousseff's admission of embezzlement by the Company, on October 20, 2014 the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2011 Notes | 71645WAT8 | $0.8810 | 0.8521% | $102.5090 |
| 2013 Notes | 71647NAD1 | $0.5000 | 0.5000% | $99.5000 |
| 2013 Notes | 71647NAE9 | $0.1880 | 0.1874% | $100.1500 |
| 2014 Notes | 71647NAJ8 | $0.3500 | 0.3462% | $100.7500 |

269.    On October 20, 2014, after the close of trading, BLOOMBERG NEWS published a detailed article about money laundering and bribery at Petrobras, reporting that Costa had admitted to investigators that he and other Petrobras officials had accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves" for a period of at least seven years.  Costa called the bribes from the companies a "three percent political adjustment," and Costa himself admitted that he had received tens of millions of dollars.  He identified several construction companies that participated in the scheme to prosecutors, including Odebrecht and Camargo Correa S.A.

270.    As a result of the revelations in the article by BLOOMBERG NEWS, on October 21, 2014 the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2012 Notes | 71645WAU5 | $0.4870 | 0.4756% | $101.9190 |
| 2013 Notes | 71647NAE9 | $0.3500 | 0.3495% | $99.8000 |
| 2014 Notes | 71647NAJ8 | $0.0750 | 0.0744% | $100.6750 |

271.    On October 27, 2014, before the market opened, Petrobras disclosed that it had set up an internal investigation "to examine evidence or facts perpetrated against the company, as well as to assist administrative measures and resulting procedures."

272.    On the disclosure of the creation of the Internal Investigative Committees, on October 27, 2014 the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.1410 | 0.1378% | $102.1890 |
| 2012 Notes | 71645WAU5 | $0.0010 | 0.0010% | $101.6920 |
| 2013 Notes | 71647NAD1 | $0.2370 | 0.2367% | $99.8880 |

273.    On Saturday, November 1, 2014, the Brazilian newspaper ESTADO DE SÃO PAULO reported that Petrobras' auditor, PwC refused to sign off on the financial results for one of Petrobras' subsidiaries, Transpetro, because the statement had been signed by Machado, one of the Petrobras executives implicated by Costa.  PwC urged the Company to fire Machado.  On November 3, 2014, Machado agreed to a 31-day unpaid leave of absence.

274.    The news that PwC refused to sign off on the Company's third quarter financial results, as independently confirmed by a news article in BLOOMBERG BUSINESS on November 3, 2014, caused the prices of certain of Petrobras' Notes to fall, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.2370 | 0.2318% | $102.0170 |
| 2012 Notes | 71645WAU5 | $0.1200 | 0.1182% | $101.4230 |
| 2013 Notes | 71647NAE9 | $0.8750 | 0.8706% | $99.6250 |
| 2014 Notes | 71647NAJ8 | $0.8500 | 0.8395% | $100.4000 |

275.    On Sunday, November 9, 2014, the FINANCIAL TIMES reported that the U.S. Department of Justice ("DOJ") had opened its own criminal investigation into Petrobras, looking

specifically into whether persons affiliated with the Company had violated the Foreign Corrupt

Practices Act, and that the SEC had opened a parallel civil investigation.  On November 10,

2014, as a result of the reporting by various media outlets that the DOJ and SEC had opened

separate investigations into the bribery scandal, the prices of certain of Petrobras' Notes fell, as

summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2012 Notes | 71645WAU5 | $0.3500 | 0.3451% | $101.0560 |
| 2013 Notes | 71647NAD1 | $0.2500 | 0.2509% | $99.3750 |
| 2014 Notes | 71647NAJ8 | $0.1000 | 0.0990% | $100.9000 |

276.    On November 13, 2014, after the close of trading, the Company issued a press

release acknowledging that if Costa's allegations were confirmed, they "could potentially affect

the Company's financial statements."  As a result, the Company delayed releasing its financial

statements for the third quarter of 2014, stating that it would need additional time to

> (i) deeply analyze the investigation in course; (ii) adjust the Company
> based on the allegations of "Operation Car Wash;" and (iii) evaluate the
> need of improving governance control, the Company isn't ready to publish
> its balance sheet regarding the third quarter of 2014 on this date.

(Translated from Portuguese.)

277.    On November 14, 2014, various media outlets including REUTERS reported that

Brazilian police conducted "Operation Doomsday," executing 45 raids, issuing 27 arrest

warrants and arresting 18 individuals including Duque and Erton Medeiros Fonseca, a director of

engineering and infrastructure at Galvão Engenharia S.A., in connection with the Petrobras

probe.  The operation yielded thousands of documents to support the criminal investigations.

Odebrecht confirmed that "its offices in Rio de Janeiro had been searched and documents

seized."  Attorneys for Fonseca provided the Brazilian newspaper GLOBO with copies of a receipt

for payment of an R$8,863,000 bribe paid to a Petrobras employee in Duque's department,

stating that their client had admitted to federal officers that he had paid bribes to execute contracts with Petrobras, under "effective threat of retaliation against contracts maintained by Galvão Engenharia S.A. with Petrobras."

278.   On November 14, 2014, following news of the arrests, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.1480 | 0.1462% | $101.1000 |
| 2012 Notes | 71645WAU5 | $1.0500 | 1.0412% | $99.8000 |
| 2013 Notes | 71647NAD1 | $1.6800 | 1.6788% | $98.3900 |
| 2013 Notes | 71647NAE9 | $0.5320 | 0.5358% | $98.7500 |
| 2014 Notes | 71647NAJ8 | $3.3150 | 3.3036% | $97.0300 |

279.   On November 17, 2014, before the market opened, the Company held an analyst conference call to discuss its financial results for the third quarter of 2014.  On this call, Foster acknowledged that Costa's allegations could potentially affect the financial statements of Petrobras and "may lead to possible adjustment" in those statements.

280.   During the Q&A portion of the call, an analyst asked what adjustments would have to be made to the Company's financial statements assuming "[BRL] 5 billion of overprice in the construction of RNEST," referring to the refinery at Abreu e Lima.  Barbassa replied that the fair price of PP&E would have to be adjusted, since there would have been an overpayment which would have to be removed.  Barbassa said that in determining fair value, the Company would need to deduct from PP&E "any amount that could be linked to bribery of any sort, any excessive price that would have been charged."

281.   Later in the day, AGENCIA BRASIL reported that Foster had confirmed that SBM bribed Petrobras employees in exchange for contracts, and that due to the "overwhelming evidence of noncompliance," SBM "will no longer be eligible to bid for further contracts with Petrobras."   Moreover, Foster admitted that "[w]e [were] informed in the past that we had

identified no irregularities at this matter.  After a few weeks or months, I was informed that there were indeed bribes to employees or former employees of Petrobras."

282.    As a result of the Company's conference call and revelation of SBM bribing Petrobras' employees, on November 17, 2014 the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $1.1000 | 1.0880% | $100.0000 |
| 2012 Notes | 71645WAU5 | $1.0030 | 1.0050% | $98.7970 |
| 2013 Notes | 71647NAD1 | $0.3900 | 0.3964% | $98.0000 |
| 2013 Notes | 71647NAE9 | $2.7500 | 2.7848% | $96.0000 |

283.    On November 18, 2014, the WALL STREET JOURNAL reported that since the arrests, Brazilian Federal Police had obtained a Galvão Engenharia S.A. executive's confession to paying roughly R$4 million in order to win contracts from Petrobras, including for projects at Petrobras' Abreu e Lima refinery.  The executive revealed to the Brazilian Federal Police that he had a meeting with Costa and a congressman in 2010, where he was told by the congressman "that to be able to win contracts, he would have to pay."

284.    On November 20, 2014, FOLHA DE S. PAULO reported Foster did not testify truthfully during congressional testimony on June 11, 2014, and that specifically, that she had falsely testified that Petrobras didn't receive any warning from Dutch authorities regarding SBM.

285.    On November 24, 2014, the Company issued a press release announcing that it had received a subpoena from the SEC requesting documents relating to an investigation of the Company.

286.    On November 24, 2014, following the news of the SEC subpoena, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2011 Notes | 71645WAT8 | $0.5340 | 0.5292% | $100.3710 |
| 2013 Notes | 71647NAD1 | $0.1850 | 0.1896% | $97.3750 |

287.    On Sunday, December 7, 2014, the NEW YORK TIMES reported that Brazil's prosecutor general said that he was preparing to indict at least 11 executives from the country's largest construction companies on charges including bribery and money laundering in connection with the Petrobras scandal.  The article also reported that Augusto Mendonça, an executive at Toyo Setal, a shipbuilding company, testified the previous week that he paid more than $23 million in bribes directly to the Workers' Party and Petrobras executives in exchange for contracts to build oil tankers.

288.    On the next trading day, December 8, 2014, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2011 Notes | 71645WAT8 | $0.4600 | 0.4569% | $100.2110 |
| 2012 Notes | 71645WAU5 | $0.7080 | 0.7168% | $98.0590 |
| 2013 Notes | 71647NAE9 | $0.9500 | 1.0106% | $93.0500 |

289.    On December 10, 2014, REUTERS reported that "Brazil's state-controlled oil firm Petrobras may have to hike fuel prices, cut spending or seek a capital injection from the government next year as a widening corruption probe threatens to temporarily leave it out of capital markets."  The article noted that if Petrobras did not publish audited financial statements, that could trigger early repayment of as much as $11 billion in bonds as well as a $5.8 billion local bank loan.

290.    On December 10, 2014 the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2011 Notes | 71645WAT8 | $0.6840 | 0.6825% | $99.5390 |
| 2012 Notes | 71645WAU5 | $1.6440 | 1.6666% | $97.0000 |
| 2013 Notes | 71647NAD1 | $0.4900 | 0.5039% | $96.7600 |

291.    On December 12, 2014, Petrobras announced that because of the impact of the bribery investigation, it was not releasing its consolidated interim financial statements for the third quarter of 2014 because those statements had not been approved by its independent auditors.  Petrobras also disclosed that it was reducing its planned levels of capital expenditures and reducing operating costs in order to "eliminat[e] the need for additional financing in the capital markets next year."  Petrobras' bribery scandal, and in particular its inability to file audited financial statements, was the reason why Petrobras could not access the capital markets and needed to reduce planned capital expenditures.  This announcement was subsequently filed with the SEC in a Form 6-K on December 15, 2014.

292.    Also on December 12, 2014, the NEW YORK TIMES reported that a Brazilian newspaper, VALOR ECONÔMICO, had obtained documents showing that in 2009, former Petrobras executive Velosa warned Foster about inflated contracts on refinery projects.  In response to VALOR ECONÔMICO, Petrobras issued a statement saying it began internal investigations into the information in 2008.

293.    On December 12, 2014, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2011 Notes | 71645WAT8 | $0.6000 | 0.6010% | $99.2300 |
| 2012 Notes | 71645WAU5 | $2.2660 | 2.3205% | $95.3840 |
| 2013 Notes | 71647NAD1 | $1.8720 | 1.9222% | $95.5170 |

294.    On Sunday, January 4, 2015, Brazilian publications reported additional facts concerning the fraud.  Specifically, (1) the publication GLOBO reported that Petrobras had created

"paper companies" to build the gas pipe network Gasene, and that costs for at least part of the enterprise had been overstated by over 1,800%; and (2) FOLHA reported that internal audits indicated that Petrobras had lost over R$1 billion on maintaining equipment that it had bought for the Comperj refinery before defining the refinery's business model and production structure, and never actually used.

295.    On January 5, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $1.276 | 1.29% | $97.6000 |
| 2012 Notes | 71645WAU5 | $2.1400 | 2.2317% | $93.7500 |
| 2013 Notes | 71647NAD1 | $0.300 | 0.32% | $94.7500 |
| 2014 Notes | 71647NAJ8 | $0.4500 | 0.4852% | $92.3000 |

296.    On January 28, 2015, Petrobras disappointed investors yet again when it published its unaudited third-quarter results after a delay of more than two months, but failed to include a dollar amount for the asset writedown that would be taken to adjust its PP&E to appropriate levels.

297.    On January 28, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.7750 | 0.7760% | $99.1000 |
| 2013 Notes | 71647NAE9 | $0.2500 | 0.2849% | $87.5000 |
| 2014 Notes | 71647NAJ8 | $0.7500 | 0.7916% | $94.0000 |

298.    On February 24, 2015, after the close of trading, Petrobras announced in a Form 6-K filing that Moody's had downgraded its global foreign currency debt ratings from Baa3 to Ba2, such that Petrobras was no longer an investment grade company for Moody's. Petrobras stated that, "[a]ccording to Moody's, this revision reflects concerns with the ongoing

investigation of corruption and possible liquidity pressures that may arise if the Company is not able to timely deliver its audited financial statements."

299.    On February 25, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $1.1890 | 1.1981% | $98.0500 |
| 2012 Notes | 71645WAU5 | $1.6990 | 1.7912% | $93.1560 |
| 2013 Notes | 71647NAD1 | $0.4000 | 0.4204% | $94.7500 |
| 2013 Notes | 71647NAE9 | $1.0000 | 1.1494% | $86.0000 |
| 2014 Notes | 71647NAJ8 | $1.4400 | 1.5492% | $91.5100 |

300.    On March 2, 2015, Petrobras announced in a Form 6-K filed with the SEC that its Executive Board had approved a two-year investment plan to divest $13.7 billion in assets, including exploration and production assets in Brazil and abroad, as well as assets in the downstream and gas and energy segments.  The Form 6-K noted that "[t]his plan is part of Petrobras' financial planning aimed at reducing leverage, preserving cash and focusing on priority investments" and that the approved divestment amounts were an increase over the $5-11 billion allocated for divestments in February 2014.  These divestments were necessitated at least in part by the fact that the Company's inability to file audited financial statements and its rating downgrade have frozen it out of international bond markets.

301.    On March 2, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2013 Notes | 71647NAD1 | $0.1250 | 0.1316% | $94.8750 |
| 2013 Notes | 71647NAE9 | $.4000 | 0.4638% | $85.8500 |

302.    On March 3, 2015, after the close of trading, REUTERS reported in an article entitled *Petrobras Scandal Takes Brazilian Politicians To Supreme Court* that a Brazilian court

official had announced that Brazil's top prosecutor had asked the Federal Supreme Court to open investigations into politicians who benefited from Petrobras kickbacks.  Brazilian prosecutors are not allowed to investigate federal congressmen or top executive branch approval without approval from the Supreme Court.  The official said that the court had been asked to authorize 28 separate investigations into 54 people, many of whom were expected to be politicians.

303.    On the next trading day, March 4, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.2610 | 0.2640% | $98.5890 |
| 2013 Notes | 71647NAD1 | $0.1000 | 0.1042% | $95.9000 |
| 2013 Notes | 71647NAE9 | $0.6000 | 0.6798% | $87.6600 |
| 2014 Notes | 71647NAJ8 | $0.2500 | 0.2674% | $93.2500 |

304.    On Sunday, March 8, 2015, the FINANCIAL TIMES reported in an article entitled *Swiss Banks Drawn Into Petrobras Scandal* that documents released by a Brazilian court outlined the use of Swiss bank accounts to launder bribe payments in the Petrobras scandal.  The article also reported that Swiss and Brazilian prosecutors had been cooperating on a criminal investigation into Petrobras-related money laundering since April 2014.

305.    On the next trading day, March 9, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $0.3090 | 0.3136% | $98.2100 |
| 2012 Notes | 71645WAU5 | $0.5590 | 0.5900% | $94.1890 |
| 2013 Notes | 71647NAD1 | $1.3000 | 1.3528% | $94.8000 |
| 2013 Notes | 71647NAE9 | $0.5000 | 0.5634% | $88.2500 |
| 2014 Notes | 71647NAJ8 | $0.2500 | 0.2674% | $93.2500 |

306.    On March 10, 2015, the NEW YORK TIMES reported in an article entitled *Former Petrobras Executive Tells Brazil Congress of Bribes* that Barusco told a congressional panel that he began accepting bribes from some of the country's top construction firms 18 years ago, and

that by 2003 "that practice had become more widespread and institutionalized."  He also estimated that the Workers' Party had received between $150 million and $200 million. Barusco's testimony was broadcast live on March 10 on the Globo TV network.

307.    On March 10, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2012 Notes | 71645WAU5 | $2.2090 | 2.3453% | $91.9800 |
| 2013 Notes | 71647NAE9 | $0.7500 | 0.8499% | $87.5000 |
| 2014 Notes | 71647NAJ8 | $1.7500 | 1.8767% | $91.5000 |

308.    On March 11, 2015, after the close of trading, REUTERS reported that the office of Brazil's comptroller general had opened a case against ten additional firms that may be involved in the Petrobras bribery and corruption scheme, namely, Alumini Engenharia, GDK, Promon Engenharia, Andrade Gutierrez, Fidens Engenharia, Sanko-Sider, Odebrecht, Odebrecht Óleo e Gás, Odebrecht Ambiental and SOG Óleo e Gás.  In addition, on March 12, 2015, Brazil's Supreme Court announced on its website that it had approved requests from Brazilian federal prosecutors to open investigations into the former and current governors of Rio de Janeiro state, as well as the governor of Acre state in the Amazon region.

309.    On March 12, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|--------|-------|----------------|----------------|---------------|
| 2012 Notes | 71645WAU5 | $0.3190 | 0.3398% | $93.5590 |
| 2013 Notes | 71647NAD1 | $0.3780 | 0.3974% | $94.7500 |

310.    On March 13, 2015, the Brazilian newspaper FOLHA DE S. PAULO reported that Petrobras had spoken with creditors about the possibility of delaying its audited financial reports by another six months, citing unnamed "senior officials at the company and state bankers."

Unless the Company reached an agreement with its creditors, if it failed to produce audited financial reports by the end of May it would have triggered early debt repayments.

311.   On March 13, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2011 Notes | 71645WAT8 | $1.1470 | 1.1698% | $96.9070 |
| 2012 Notes | 71645WAU5 | $1.4340 | 1.5327% | $92.1250 |
| 2014 Notes | 71647NAJ8 | $0.6250 | 0.6766% | $91.7500 |

312.   On March 18, 2015, the TCU announced that it had chosen to investigate whether Petrobras board members mismanaged the Company, and Brazil's office of the comptroller general announced that it had added six more construction and engineering firms to its investigation of the Petrobras bribery and corruption scheme.   In addition, Swiss authorities announced that they had frozen hundreds of millions of dollars in assets linked to the scandal and had discovered hundreds of accounts at Swiss banks used to funnel bribes.

313.   The following day, March 19, 2015, the prices of certain of Petrobras' Notes fell, as summarized in the table below.

| Series | CUSIP | Price Drop ($) | Price Drop (%) | Closing Price |
|---|---|---|---|---|
| 2012 Notes | 71645WAU5 | $1.2880 | 1.3975% | $90.8750 |
| 2014 Notes | 71647NAJ8 | $0.3500 | 0.3885% | $89.7500 |

314.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs have suffered significant losses and damages.

## XI.   THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER

315.   During the Relevant Period, the Exchange Act Defendants had both the motive and opportunity to commit fraud.   They also had actual knowledge of the misleading nature of

the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, the Exchange Act Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of the securities, such as Plaintiffs.

### A.    PETROBRAS, PIFCO AND PGF

316.    The evidence that Petrobras and its finance subsidiaries PifCo and PGF knew of the bribery and corruption scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in § IX, *supra*, or at a minimum were reckless for not knowing of these matters, includes the following:

a)    Persons involved in implementing the bribery and corruption scheme and inflating Petrobras' asset values were high-ranking Petrobras executives, including the former head of Petrobras' refining division and a former director of engineering and services, and a former director of the international division, whose knowledge may be imputed to Petrobras.  ¶¶68-71, 74-75, 78, 90, 95-96, 101, 118, 263, 276, 306.

b)    From 2009 to 2013, the TCU reported directly to Petrobras' Board regarding widespread overcharging on contracts and irregular tendering practices at the Abreu e Lima refinery, and recommended that the project be suspended until the irregularities were resolved.  The Board overruled this recommendation.  ¶¶84.

c)    Beginning in 2009, Petrobras executive Velosa repeatedly warned Gabrielli, Foster and other members of management about the scheme.  ¶¶96, 98, 292.

d)    Youssef has stated in an October 4, 2014 plea document that "the Presidency of the state run company had knowledge of the facts," and that CEO Gabrielli had

once personally charged him with paying expenses that had been frozen on account of irregularities.  ¶100.

e)  Prosecutors have frozen the assets of former CEO Gabrielli and are preparing an indictment against him in connection with his involvement in the bribery and corruption scheme.  One of the persons involved in the scheme has said that Petrobras' CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 to 2010) both knew of and understood the scheme. ¶¶100, 104.

f)  In 2009, a Petrobras executive warned then-CEO Foster about inflated contracts on refinery projects, and was fired soon thereafter.  ¶¶96, 98, 292.

g)  The fact that the scheme involved many outside parties of major importance to Petrobras, including more than 27 contractors, dozens of politicians from 6 political parties, and a former energy minister, supports an inference that the Company knew of the scheme or was reckless for not knowing of it.  ¶¶77, 98.

h)  The fact that the scheme caused Petrobras' asset values to be overstated by at least approximately USD $2.5 billion, and involved contracts valued at USD $81.4 billion, supports an inference that the fraud was so wide-reaching and pervasive that the Company knew of the scheme or was reckless for not knowing of it.  ¶124.

i)  In the minutes to the April 22, 2015 Board meeting at which the Company's 2014 financial statements were approved, Petrobras Board member Silvio Sinedino blamed managerial recklessness for the fraud, stating "There was no control of

conformity [with the Company's rules and procedures] by the high ranks, allowing the deviations that are revealed now."

j)    The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that the Company knew of the scheme or was reckless for not knowing of it.

### B.   GABRIELLI

317.   The evidence that Gabrielli knew of the bribery and corruption scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in § IX, *supra*, or at a minimum were reckless for not knowing of these matters, includes the following:

a)    Prosecutors have frozen the assets of Gabrielli and are preparing an indictment against him.  One of the persons involved in the scheme has said that Petrobras' CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 – 2010) both knew of and understood the scheme.  ¶¶100, 104.

b)    Beginning in 2009, Petrobras executive Velosa repeatedly warned Gabrielli and other members of management about the scheme.  ¶¶119, 121.

c)    Beginning in 2009, the TCU repeatedly raised red flags concerning overbilling and bidding irregularities at major Petrobras projects.  The Company claimed that it investigated these red flags and found no signs of wrongdoing.  ¶¶79, 84-85, 89, 91, 99, 102, 235, 242, 244.

d)    Youssef has stated in an October 4, 2014 plea document that "the Presidency of the state run company had knowledge of the facts," and that CEO Gabrielli had once personally charged him with paying expenses that had been frozen on account of irregularities.  ¶100.

e)     The fact that the scheme involved many outside parties of major importance to Petrobras, including more than 27 contractors, dozens of politicians from 6 political parties, and a former energy minister, supports an inference that as CEO, Gabrielli knew of the scheme or was reckless for not knowing of it.  ¶¶77, 98.

f)     The fact that the scheme caused Petrobras' asset values to be overstated by at least approximately USD $2.5 billion, and involved contracts valued at USD $81.4 billion, supports an inference that the fraud was so wide-reaching and pervasive that as CEO, Gabrielli knew of the scheme or was reckless for not knowing of it.  ¶124.

g)     The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Gabrielli, the CEO of the Company, either knew of the scheme or was reckless for not knowing of it.

**C.     FOSTER**

318.    The evidence that Foster knew of the bribery and corruption scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in § IX, *supra*, or at a minimum were reckless for not knowing of these matters, includes the following:

a)     One of the persons involved in the scheme has said that Petrobras' CEO and President Rousseff (who was the Chairwoman of the Petrobras Board from 2003 – 2010) both knew of and understood the scheme.  ¶100.

b)     Beginning in 2009, Petrobras executive Velosa repeatedly warned Foster and other members of management about the scheme.  ¶¶96, 198, 292.

c)      Beginning in 2009, the TCU repeatedly raised red flags concerning overbilling and bidding irregularities at major Petrobras projects.  The Company claimed that it investigated these red flags and found no signs of wrongdoing.  ¶¶79, 84-85, 89, 91, 99, 102, 235, 242, 244.

d)      The fact that the scheme involved many outside parties of major importance to Petrobras, including more than 27 contractors, dozens of politicians from 6 political parties, and a former energy minister, supports an inference that as CEO, Foster knew of the scheme or was reckless for not knowing of it.  ¶¶77, 98.

e)      The fact that the scheme caused Petrobras' asset values to be overstated by at least approximately USD $2.5 billion, and involved contracts valued at USD $81.4 billion, supports an inference that the fraud was so wide-reaching and pervasive that the Company knew of the scheme or was reckless for not knowing of it.  ¶124.

f)      The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Foster, the CEO of the Company, either knew of the scheme or was reckless for not knowing of it.

D.      BARBASSA

319.    The evidence that Barbassa knew of the bribery and corruption scheme, the inflation of Petrobras asset valuations, and the falsity of the statements discussed in § IX, *supra*, or at a minimum were reckless for not knowing of these matters, includes the following:

a)      Beginning in 2009, the TCU repeatedly raised red flags concerning overbilling and bidding irregularities at major Petrobras projects.  The Company claimed that

it investigated these red flags and found no signs of wrongdoing.  ¶¶79, 84-85, 89, 91, 99, 102, 235, 242, 244.

b)      The fact that the scheme involved many outside parties of major importance to Petrobras, including more than 27 contractors, dozens of politicians from 6 political parties, and a former energy minister, supports an inference that as CFO, Barbassa knew of the scheme or was reckless for not knowing of it.  ¶¶77, 98.

c)      The fact that the scheme caused Petrobras' asset values to be overstated by at least approximately USD $2.5 billion, and involved contracts valued at USD $81.4 billion, supports an inference that the fraud was so wide-reaching and pervasive that the Company knew of the scheme or was reckless for not knowing of it. ¶124.

d)      The fact that the scheme related to major assets and critical infrastructure of the Company, such as key refineries, which are typically the subject of close, ongoing scrutiny by a company's senior management, supports an inference that Barbassa, the CFO of the Company, either knew of the scheme or was reckless for not knowing of it.

## XII.    PLAINTIFFS RELIED UPON DEFENDANTS' MISREPRESENTATIONS TO PLAINTIFFS' DETRIMENT

### A.    PLAINTIFFS' DIRECT RELIANCE ON DEFENDANTS' MISREPRESENTATIONS

320.    During the Relevant Period, Plaintiffs employed in-house investment managers to manage their investment portfolios and to make investment decisions on behalf of Plaintiffs. Throughout the Relevant Period, Plaintiffs' investment managers undertook rigorous, security-specific research on behalf of Plaintiffs' investments to identify companies with attractive risk-adjusted returns.

321.     Plaintiffs employed an analytical, research-based approach to determine whether to buy, sell, or hold securities. Consistent with this approach, in making investment decisions regarding Petrobras and its affiliates, Plaintiffs relied on numerous sources of information, including Petrobras' publicly filed financial statements, corporate web page, press releases, and conference calls with investors, along with industry analyst reports. With respect to Petrobras' financial statements, Plaintiffs reviewed the Forms 20-F and Forms 6-K that Petrobras filed with the SEC, including the representations contained therein described in Section IX. In particular, Plaintiffs' investment managers relied upon Petrobras' representations concerning its net income, value of assets, total costs and periodic expenses, PP&E, and anti-bribery and anti-corruption policies. In addition, Plaintiffs relied upon Petrobras' representations concerning the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting.

322.     Plaintiffs' investment managers relied on Petrobras' statements as being materially complete and as not omitting material information, including information regarding Petrobras' financial condition.  Plaintiffs' investment managers did not know, and in the exercise of reasonable diligence could not have known, that Petrobras' statements during the Relevant Period were materially false and misleading or materially incomplete, especially because, as explained above, Petrobras repeatedly (and falsely) touted its internal controls and anti-bribery and anti-corruption policies.

323.     Petrobras' false or misleading statements in its public statements, including Petrobras' representations concerning its net income and periodic expenses, value of assets, PP&E, anti-bribery and anti-corruption policies, and the adequacy of its disclosure controls and procedures, including its internal controls over financial reporting, had a material influence on,

and were a substantial factor in bringing about, Plaintiffs' investment managers' investment decisions with respect to the Petrobras Securities.

324.    In reasonable reliance upon the materially false and misleading statements included in Petrobras' public statements, Plaintiffs purchased the Petrobras Securities at artificially inflated prices.

**B.    PRESUMPTION OF RELIANCE: THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES**

325.    With respect to their Exchange Act claims, except those brought under Section 18 of the Exchange Act, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

   a)    the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

   b)    the omissions and misrepresentations were material;

   c)    the securities of Petrobras, PifCo, and PGF traded in an efficient market;

   d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the securities of Petrobras, PifCo, and PGF; and

   e)    Plaintiffs purchased the securities of Petrobras, PifCo, and/or PGF between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

326.    At all relevant times, the markets for the securities of Petrobras, PifCo, and PGF were efficient for the following reasons, among others:

a)    as a regulated issuer, Petrobras filed periodic public reports with the SEC on a consolidated basis, including information on behalf of its subsidiaries PifCo and PGF;

b)    Petrobras regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c)    Petrobras was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

d)    the securities of Petrobras, PifCo, and PGF were actively traded in efficient markets.

327.    As a result of the foregoing, the markets for the securities of Petrobras, PifCo, and PGF promptly digested current information regarding the Company and its subsidiaries from all publicly available sources and reflected such information in the prices of the securities of Petrobras, PifCo, and PGF.  Under these circumstances, Plaintiffs were injured by their purchases of the securities of Petrobras, PifCo, and/or PGF, during the Relevant Period, at artificially inflated prices, and the presumption of reliance applies.

328.    Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its subsidiaries, Plaintiffs are

entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

### C.     NO SAFE HARBOR

329.    The Exchange Act Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements ("FLS") issued during the Relevant Period were ineffective to shield those statements from liability.

330.    The Exchange Act Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of the securities of Petrobras, PifCo, and/or PGF who knew that the FLS was false.  None of the historic or present tense statements made by the Exchange Act Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Exchange Act Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XIII.  PLAINTIFFS HAVE SUFFERED LOSSES AS A RESULT OF THEIR PURCHASES OF PETROBRAS SECURITIES

331.    During the Relevant Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the securities issued by Petrobras, PifCo, and PGF, and operated as a fraud or deceit on purchasers of such securities, such as Plaintiffs, by misrepresenting Petrobras' asset values, expenses, net income, internal controls, and anti-corruption policies.

332. Later, as the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct was disclosed to the market, the price of the securities of Petrobras, PifCo, and PGF fell as the prior artificial inflation ceased to prop up their respective prices. As a result of its purchases of the securities issued by Petrobras, PifCo, and PGF during the Relevant Period, Plaintiffs suffered economic losses.

333. Indeed, Petrobras Board member Silvio Sinedino, in the Board minutes regarding the approval of the Company's 2014 financial statements, noted that, "[t]he discovery and self-disclosure of the engagement of former Directors in the so-called Operação Lavo Jato destroyed the value of the Company at the Stock Exchange and shook its credibility in the oil and gas sector."

334. In part due to Petrobras' own delays in recording the necessary writedowns, the full truth regarding the overstatement of asset values and the extent of the corruption has not yet been disclosed. Should further corrective disclosures cause the value of Petrobras securities to further decline, Plaintiffs reserve the right to claim damages based on those disclosures.

## XIV. THE ARBITRATION CLAUSE IN PETROBRAS' BYLAWS IS INAPPLICABLE TO PLAINTIFFS

335. Article 58 of Petrobras' bylaws contains an arbitration provision stating that:

Disputes or controversies involving the Corporation, its shareholders, managers and members of the Audit Board shall be resolved according to the rules of the Market Arbitration Chamber, with the purpose of applying the provisions contained in Law no. 6,404 of 1976, in these Bylaws, in the rules issued by the National Monetary Council, by the Central Bank of Brazil and by the Brazilian Securities and Exchange Commission (Comissão de Valores Mobiliários – CVM) as well as in all further rules applicable to the operation of the capital market in general, in addition to those contained in the contracts occasionally signed by Petrobras with the stock exchange or an organized over-the-counter market entity accredited at the Brazilian Securities and Exchange Commission (Comissão de Valores Mobiliários – CVM), with the purpose of the adoption of corporate governance standards established by these entities and of the respective rules on differentiated practices of corporate governance, if such is the case.

336.    As this Court has already held, such a provision could not possibly apply to plaintiffs bringing claims under the U.S. securities laws regarding securities purchased on a U.S. exchange.  *See In re Petrobras Sec. Litig.*, Civ. A. No. 14-cv-9662-JSR, slip op. at 43-44 (July 30, 2015).

## XV.    THE PENDING CLASS ACTION TOLLS THE STATUTES OF LIMITATIONS APPLICABLE TO PLAINTIFFS' CLAIMS

337.    The statutes of limitations applicable to Plaintiffs' claims have been tolled by the pending class action against Defendants, pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974).  On December 8, 2014, the first of several putative class actions was initiated against Petrobras.  *Kaltman v. Petróleo Brasiliero S.A. - Petrobras*, Case No. 14-cv-9662-JSR.   On December 24, 2014, another putative class action was initiated against all Defendants.  *City of Providence v. Petróleo Brasiliero S.A. – Petrobras*, Case No. 14-cv-10117-JSR.  The class actions were consolidated on February 17, 2015.  The case is currently pending.  Accordingly, the statutes of limitations applicable to Plaintiffs' claims against Petrobras were tolled from December 8, 2014, and against all other Defendants from December 24, 2014 to the full extent permitted by *American Pipe*.

## XVI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Section 10(b) of the Exchange Act And Rule 10b-5
### Against The Exchange Act Defendants

338.    Plaintiffs reallege each and every allegation above as if fully set forth herein.

339.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against the Exchange Act Defendants.  The Exchange Act Defendants (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary

to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

340.    The Exchange Act Defendants promoted and sold the Petrobras Notes purchased by Plaintiffs pursuant to false and misleading statements contained in SEC filings, press releases, conference call statements, and sustainability reports.  The Exchange Act Defendants made untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

341.    The Exchange Act Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.  In addition, senior executives whose knowledge may be imputed to Petrobras, PifCo and PGF knew of and participated in the fraud.

342.    Plaintiffs purchased Petrobras Notes without knowledge that the Exchange Act Defendants had misstated or omitted material facts.  In purchasing Petrobras Notes, Plaintiffs relied directly or indirectly on false and misleading statements and omissions made by the Exchange Act Defendants.  Plaintiffs were damaged as a result of their reliance on the Exchange Act Defendants' false statements and misrepresentations and omissions of material facts.

343.    At the time of the Exchange Act Defendants' false statements, misrepresentations and omissions, Plaintiffs were ignorant of their falsity and believed them to

be true.  Plaintiffs would not have purchased or otherwise acquired Petrobras securities as they did had they known the truth about the matters discussed above.

344.    Plaintiffs are filing this action within two years following discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiffs' claim, and within five years after the violations with respect to Plaintiffs' investments.

345.    By virtue of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

346.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their purchases of Petrobras Notes.

## SECOND CAUSE OF ACTION
### Violation of Section 18 of the Exchange Act
### Against the Exchange Act Defendants, Oliveira, and
### Tinoco (together, the "Section 18 Defendants")

347.    Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

348.    This claim is brought by Plaintiffs under Section 18 of the Exchange Act against the Section 18 Defendants.

349.    The Section 18 Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Petrobras and PGF's predecessor in interest, PifCo, including filings made on Form 20-F.

350.    Specifically, in connection with the purchase of Petrobras Notes, Plaintiffs and/or their agents actually read and relied upon the SEC filings of Petrobras, including the 2012 Form 20-F, the 2013 Form 20-F, and quarterly earnings reports filed on Form 6-K.  Plaintiffs and/or

their respective agents relied on the statements in those filings as being materially complete, and as not omitting material information.  The reliance by Plaintiffs and/or their respective agents was reasonable. When the truth began to emerge about the false and misleading statements and omissions in the documents and reports filed by Petrobras, PGF, and PifCo with the SEC, Plaintiffs were damaged by the resulting drop in the value of Petrobras Notes.

351.   As a direct and proximate result of the Section 18 Defendants' wrongful conduct, Plaintiffs suffered damages in connection with its purchases of Petrobras Notes.

352.   Plaintiffs are filing this action within one year following discovery of the facts constituting the violation, and within three years after the violations with respect to Plaintiffs' investments.

353.   By virtue of the foregoing, the Section 18 Defendants have violated Section 18 of the Exchange Act.

### THIRD CAUSE OF ACTION
### Violation of Section 20(a) of the Exchange Act
### Against The Individual Defendants

354.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

355.   This count is asserted against the Individual Defendants, and is based upon Section 20(a) of the Exchange Act.

356.   Each of the Individual Defendants by virtue of their control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a control person of Petrobras, PifCo and PGF within the meaning of Section 20(a) of the Exchange Act.

357.   As a result of their control of Petrobras, PifCo and PGF, the Individual Defendants reviewed, or had the opportunity to review, the statements at issue in this litigation

and therefore knew or should have known that those statements contained misrepresentations and omissions.  The Individual Defendants could have prevented the issuance of the SEC filings, press releases, conference call statements, and sustainability reports at issue in this litigation, or caused them to be corrected.  As a result, the Individual Defendants did not act in good faith.

358.   As set forth above, Petrobras, PifCo and PGF each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  By virtue of their positions as control persons, the Individual Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

359.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Petrobras Notes.

**FOURTH CAUSE OF ACTION**
**Violation of Section 11 of the Securities Act**
**Against The Securities Act Defendants**

360.   Plaintiffs repeat and reallege the allegations set forth in ¶¶1-314 and 320-337 above as if set forth fully herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of Defendants to defraud Plaintiffs.  This count is predicated upon defendants' *strict liability* for making false and materially misleading statements in the 2012 Registration Statement.

361.   This cause of action is brought pursuant to Section 11 of the Securities Act against the Securities Act Defendants.

362.   The 2012 Registration Statement (including documents incorporated by reference therein) were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.  To the extent that any of the false

statements at issue are deemed to be statements of opinion, the Securities Act Defendants did not hold those opinions at the time the statements were made.

363.   The Securities Act Defendants are strictly liable to Plaintiffs for the misstatements and omissions.

364.   Each of the Section 11 Officer and Director Defendants signed the 2012 Registration Statement, as detailed in ¶¶23-33 above.

365.   Petrobras, PifCo and PGF caused the 2012 Registration Statement to be issued to investors in connection with the offering and sale of the 2013 Notes and 2014 Notes, as detailed in ¶¶54-06 above.

366.   Each of the Underwriter Defendants acted as an underwriter in the sale of the 2013 Notes and 2014 Notes, and helped draft and disseminate the offering documents for those securities.  Each of the Underwriter Defendants was an underwriter for the specific offerings that are identified in ¶¶36-38, 54-60 above.

367.   The Securities Act Defendants owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  The Securities Act Defendants did not fulfill their duty make a reasonable and diligent investigation of the statements contained in or incorporated by reference into the 2013 Offering Documents and 2014 Offering Documents and did not possess reasonable grounds for believing that the 2013 Offering Documents and 2014 Offering Documents did not contain an untrue statement of material fact or omit to state a material fact

required to be stated therein or necessary to make the statements therein not misleading.  As such, the Securities Act Defendants are liable.

368.    By reason of the conduct herein alleged, each of the Securities Act Defendants violated Section 11 of the Securities Act.

369.    Plaintiffs acquired certain of the 2013 Notes and 2014 Notes in the 2013 Offering and 2014 Offering pursuant to the 2012 Registration Statement.

370.    At the time they obtained 2013 Notes and 2014 Notes, Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts and/or omissions of material facts in the 2013 Offering Documents and 2014 Offering Documents.

371.    Plaintiffs have sustained damages.  The value of the 2013 Notes and 2014 Notes has declined substantially subsequent to, and due to, the Securities Act Defendants' violations.

372.    By virtue of the foregoing, Plaintiffs are entitled to damages under Section 11, as measured by the provisions of Section 11(e), jointly and severally from each of the Securities Act Defendants.

### FIFTH CAUSE OF ACTION
### Violation Of Section 12(a)(2) Of The Securities Act
### Against PGF And The Underwriter Defendants

373.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-314 and 320-337 above as if set forth fully herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of Defendants to defraud Plaintiffs.

374.    This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act against PGF and the Underwriter Defendants.

375.    PGF, its predecessor in interest PifCo, and the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of Petrobras Notes issued in the 2013 Offering and 2014 Offering pursuant to the 2013 Offering Documents and 2014 Offering Documents.

376.    Plaintiffs purchased 2013 Notes and 2014 Notes from the Underwriter Defendants in the 2013 Offering and 2014 Offering pursuant to the materially false and misleading 2013 Offering Documents and 2014 Offering Documents.  Specifically, Plaintiffs purchased 2013 Notes in the offering from Defendants Merrill Lynch and Morgan Stanley and purchased 2014 Notes in the offering from Defendant J.P. Morgan as set forth in the table in ¶64.  The 2013 Offering and 2014 Offering were firm commitment underwritings, in which title passed directly from the Underwriter Defendants to purchasers of Petrobras Notes such as Plaintiffs.

377.    The 2013 Offering Documents and 2014 Offering Documents contained untrue statements of material facts, omitted to state other facts required to be disclosed and/or necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  To the extent that any of the false statements at issue are deemed to be statements of opinion, PGF, its predecessor in interest PifCo, and the Underwriter Defendants did not hold those opinions at the time the statements were made.

378.    PGF, PifCo and the Underwriter Defendants owed to Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 2013 Offering Documents and 2014 Offering Documents, to ensure that such statements were true and that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  PGF, PifCo and the Underwriter Defendants did not fulfill their duty to make a reasonable and diligent investigation of the statements contained in or

incorporated by reference into the 2013 Offering Documents and 2014 Offering Documents and did not possess reasonable grounds for believing that the 2013 Offering Documents and 2014 Offering Documents did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

379.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material facts and/or omissions of material facts contained in the 2013 Offering Documents and 2014 Offering Documents when they purchased or acquired 2013 Notes and 2014 Notes.

380.    By reason of the conduct alleged herein, PGF, PifCo and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.

381.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based.  Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public.

382.    Plaintiffs sustained material damages in connection with their purchases of 2013 Notes and 2014 Notes.  Plaintiffs have the right to rescind and recover the consideration paid for the 2013 Notes and 2014 Notes purchased in the 2013 Offering and 2014 Offering, respectively, and hereby elect to rescind and tender those Notes to PGF and the Underwriter Defendants.

**SIXTH CAUSE OF ACTION**
**Violation Of Section 15 Of The Securities Act**
**Against Petrobras And The Section 15 Officer And Director Defendants**

383.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-314 and 320-337 above as if set forth fully herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of Defendants to defraud Plaintiffs.

384.    This count is asserted against Petrobras and the Section 15 Officer and Director Defendants and is based upon Section 15 of the Securities Act.

385.    Each of Petrobras and the Section 15 Officer and Director Defendants was, by virtue of their control, ownership, offices, directorship, and specific acts, at the time of the wrongs alleged herein and as set forth herein, a controlling person of PGF and/or PifCo within the meaning of Section 15 of the Securities Act.  Because of their position of control and authority over these entities, each of Petrobras and the Section 15 Officer and Director Defendants was able to, and did, control (i) the contents of the 2013 Offering Documents and 2014 Offering Documents; and (ii) the actions of PGF and/or PifCo.  As a result, each of Petrobras and the Section 15 Officer and Director Defendants is liable under Section 15 of the Securities Act for PGF's primary violation of Section 11 of the Securities Act, both in its own capacity and as successor in interest to PifCo.  *See* ¶¶20-21, *supra*.

386.    Each of the Section 15 Officer and Director Defendants had the power and influence and exercised the same to cause PGF and/or PifCo to engage in the acts described herein.

387.    Petrobras and the Section 15 Officer and Director Defendants' control, ownership and position made them privy to and provided them with knowledge of the material facts concealed from Plaintiffs.

388.    By virtue of the conduct alleged herein, Petrobras and the Section 15 Officer and Director Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs for damages suffered as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, as follows:

389.    For rescission;

390.    For an award of compensatory damages against Defendants in favor of Plaintiffs for damages sustained as a result of Defendants' wrongdoing;

391.    For an award to Plaintiffs of their costs and disbursements in this suit, including reasonable attorney's fees and expert fees; and

392.    For such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated: November 6, 2015

*/s/ Geoffrey C. Jarvis*
Jay W. Eisenhofer
Geoffrey C. Jarvis
Deborah A. Elman
Robert Gerson
David M. Haendler
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2015, I filed the foregoing upon all counsel of record by using the CM/ECF system.  The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing (NEF).

/s/ Geoffrey C. Jarvis_____
Geoffrey C. Jarvis